947 P.2d 223 (1997)
The CITY OF SEATTLE, a municipal corporation, Respondent,
v.
Bruce BLUME and Ann Stever Blume, husband and wife, and the marital community composed thereof, Petitioners.
No. 64462-4.
Supreme Court of Washington, En Banc.
Argued May 27, 1997.
Decided November 13, 1997.
Adolph & Bintinger, Robert Adolph, Paul Bintinger, Seattle, for Petitioners.
Mark Sidran, Seattle City Atty., Phillip Brenneman, Marcia M. Nelson, Asst. City Attys., Seattle, for Respondent.
*224 MADSEN, Justice.
Petitioners, Bruce and Ann Stever Blume, filed a counterclaim for damages against the City for intentional interference with a business expectancy for the City's alleged delays in processing their building permit. They appeal a Court of Appeals' decision affirming the trial court's dismissal of their counterclaim. We reverse and remand.

STATEMENT OF THE CASE
In February 1987, Bruce and Ann Stever Blume applied to the City of Seattle Department of Construction and Land Use (DCLU) for a Master Use Permit (MUP) to build an office/research facility known as "University Center Phase II" which would be located in Seattle's University District at 4700 Ninth Avenue N.E. Since 1936, the Blume family has maintained control and ownership of the University Center property. The area houses numerous car dealerships and repair facilities, light industrial uses, retail businesses, strip malls, and high-rise condominium and office projects (such as Safeco headquarters). The proposed University Center Phase II site is adjacent to Phase I[1], and houses an existing auto repair shop and a boat and auto sales lot.
In 1986, the City of Seattle adopted the Neighborhood Commercial Land Use Policies which zoned the site for the proposed University Center Phase II as NC3/85, allowing commercial development to a height of 85 feet and a size of 180,000 square feet. At present, the average time to obtain a permit in Seattle is two and one-half months. In the late 1980's, when the Blumes' project was proposed, permit time was longer, averaging as long as nine months.
In accord with the areas NC3/85 zoning, Phase II was designed as a six-story office/research facility with a maximum height of 82 feet consisting of 116,000 square feet of office/research space and 16,000 square feet of retail space and incorporating 264 on-site parking spaces, most of which would be underground and could also be used as additional parking for the retail Phase I businesses after office hours. In accordance with average permitting processing time, the Blumes estimated that the MUP would be issued in six to nine months, that the building permit would be issued, and that construction would begin in late fall of 1987.
By letter dated April 17, 1987, from Cheryl Waldman of the DCLU, the City notified the Blumes that it was requiring an Environmental Impact Statement (EIS) for the Phase II project, citing transportation concerns. Ms. Waldman indicated concern with cumulative impacts with four other projects. However, Mr. Blume notes that just prior to the submission of the Phase II proposal, a substantially identical project, also with cumulative impacts, was approved with no EIS requirement.
As a prerequisite to submitting the EIS, the Blumes retained the Transpo Group, a transportation planning and traffic engineering consultant, to prepare traffic studies. In February 1987, a scope of work agreement was organized with Chris Larsen of the City. In May 1987, the Blumes approved the scope of work, and the completed traffic analysis was forwarded to the Blumes in August 1987. Thereafter, the Blumes state the City changed its personnel overseeing the traffic study and assigned two new individuals who then materially altered the scope of work previously agreed upon, requiring extensive, timely, and costly pattern studies. Again, the Blumes contend that other projects in the area, approved by the City, were never subjected to such onerous scrutiny.[2]
*225 The Blumes' draft EIS was submitted to the City on June 21, 1988. Commenting to the press on the Blumes' submission of the draft EIS, Cheryl Waldman of the DCLU stated in an interview published in the University of Washington Daily on June 21, 1988, that the City would make its decision on the Blumes' MUP by the end of 1988. However, the City did not approve the final EIS until January 1990. The Blumes state there is no evidence of correspondence or other contact by the City with the Blumes' environmental traffic consultants which might explain why the City took over 19 months to approve the final EIS. The City contends, however, that the Blumes, not the City, were responsible for the delays in completing the draft and final EIS statement.
In 1990, the City of Seattle gave the Blumes its draft "Analysis and Decision" regarding the issuance of the Blumes' MUP for Phase II. The City refused to approve the MUP application and set forth numerous requirements to be met before a permit would be issued. Among other things, the City demanded a reduction in the size of the project space to either 49,000 or 89,000 square feet and also required additional parking spaces. The City also insisted on a reduction in the structure from six stories to four stories and the implementation of further traffic mitigation measures. Consequently, the Blumes had to redesign the project.
After the DCLU issued its draft MUP decision, the Blumes allege the City conditioned issuance of the permit on the approval of the two neighborhood groups that opposed the Phase II project. The Blumes contend the DCLU was, in effect, delegating land use decision-making authority impermissibly to these groups.[3] The City states, however, that any negotiations the Blumes carried out with neighborhood groups were wholly voluntary. The Blumes, the City asserts, decided to negotiate with opposing neighborhood groups, which delayed the permitting process, so that those differences could be settled rather than having their disputes resolved in litigation. Throughout the balance of 1990 and 1991, the Blumes engaged in numerous meetings with representatives of the opposing neighborhood groups in an effort to meet their demands.
In late 1991 and early 1992, the Blumes submitted compromises to the City of Seattle which included reducing the height of the building to four floors, broadening the footprint of the building, mitigating traffic, including additional parking, etc. The City responded by letter dated May 28 with a list of additional conditions. The Blumes state that in June 1992, after five years and four months of delays and the expenditure of funds in excess of one million dollars and lost business opportunities, that the project was no longer feasible. In a letter dated June 2, 1992, the Blumes formally requested the withdrawal of the Phase II permit application.
On May 20, 1988, the Blumes executed a loan agreement with the City for $1,300,000 in Community Development Block Grant (CDBG) funds.[4] This action was commenced by the City of Seattle to collect unpaid interest on the 1.3 million dollar loan made to the Blumes. The Blumes paid the principal, but withheld payment of the interest as an offset for the damages they assert they suffered as a result of the City's delays and filed a counterclaim in response to the City's action. *226 They allege the City, by delaying the permitting process, acted in an arbitrary and capricious manner in violation of RCW 64.40. The Blumes also claim the City intentionally interfered with a business expectancy.
The City of Seattle moved to dismiss the Blumes' counterclaims on a motion for summary judgment in Superior Court. The trial court dismissed both claims, finding that the Blumes' decision to take themselves out of the permitting process precluded their tortious interference claim and that the RCW 64.40 claim was barred by the statute of limitations.
In an unpublished opinion, the Court of Appeals affirmed, finding that both claims were barred by the 30-day statute of limitations period provided in RCW 64.40.030. The Blumes filed a motion for reconsideration arguing their claim for tortious interference with a business expectancy was not barred by the statute of limitations provision contained in RCW 64.40.030. The Court of Appeals granted in part the motion for reconsideration and changed its opinion, stating in a footnote that even if the 30-day statute of limitations did not apply to the tortious interference claim, it was the Blumes' independent business judgment to withdraw from the permitting process that caused any damages suffered, citing King v. City of Seattle, 84 Wash.2d 239, 525 P.2d 228 (1974). Court of Appeals' Order Granting in Part Motion for Reconsideration and Changing Opinion at 2 (July 23, 1996).
The Blumes filed a petition for review in this court arguing that the Court of Appeals' decision to bar the tortious interference claim based on RCW 64.40.030 is contrary to this court's decision in Stenberg v. Pacific Power & Light Co., 104 Wash.2d 710, 709 P.2d 793 (1985), and that their decision to withdraw from the permitting process does not preclude the tortious interference claim. This court granted the Blumes' petition for review.

STATUTE OF LIMITATIONS
Petitioners contend that the 30-day statute of limitations provided in RCW 64.40.030 does not apply to their tortious interference claim, which has a three-year statute of limitations. See Stenberg, 104 Wash.2d 710, 709 P.2d 793. The Court of Appeals stated in a footnote that it was unclear whether Petitioners' tortious interference claim was separate from their claim under RCW 64.40.020. Based on the court's belief that the tortious interference claim was part of the claim for damages under RCW 64.40.020, it affirmed the dismissal of the claim based on the 30-day statute of limitations period provided in RCW 64.40.030.
Contrary to the Court of Appeals' statements, Petitioners' tortious interference claim is separate from their claim for damages pursuant to RCW 64.40.020. Thus, it was erroneous for the court to find that Petitioners' tortious interference claim was time barred under RCW 64.40.030. Section 4.16.080(2) of the Revised Code of Washington establishes the limitations period for common law torts not specifically enumerated in other limitations sections. See Stenberg, 104 Wash.2d 710, 709 P.2d 793. Intentional interference with a business expectancy is such a common law tort, see Calbom v. Knudtzon, 65 Wash.2d 157, 161, 396 P.2d 148 (1964), and it is not specifically addressed by any other limitations section. As such, the limitations period for a cause of action for tortious interference is three years, as specified in RCW 4.16.080(2), and the Blumes' claim was filed within the allowable time period.

INDEPENDENT BUSINESS JUDGMENT RULE
Next, we turn to the Court of Appeals' finding that the Blumes' "independent business judgment" to withdraw from the permitting process precluded their claim as a matter of law. Under the "independent judgment rule," if a plaintiff, by the exercise of independent business judgment, elects not to pursue available legal remedies, the wrongful act of the defendant is not the proximate cause of the plaintiff's damages. Marsh v. Commonwealth Land Title Ins. Co., 57 Wash.App. 610, 789 P.2d 792 (1990); Hillis Homes, Inc. v. Snohomish County, 32 Wash.App. 279, 647 P.2d 43 (1982); Grader v. City of Lynnwood, 53 Wash.App. 431, 767 *227 P.2d 952, cert. denied, 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989).
This court has explained that proximate cause consists of two elements: cause in fact and legal causation. Hartley v. State, 103 Wash.2d 768, 777, 698 P.2d 77 (1985). Cause in fact refers to the "but for" consequences of an act, that is, the immediate connection between an act and an injury. Id. at 778, 698 P.2d 77. Legal causation rests on policy considerations determining how far the consequences of a defendant's acts should extend. It involves the question of whether liability should attach as a matter of law, even if the proof establishes cause in fact. Id. at 779, 698 P.2d 77. The issue of proximate cause is reviewable on appeal as a question of law if all inferences from the evidence are incapable of reasonable doubt. Bernethy v. Walt Failor's, Inc., 97 Wash.2d 929, 935, 653 P.2d 280 (1982) (quoting Mathers v. Stephens, 22 Wash.2d 364, 370, 156 P.2d 227 (1945)).
The present case provides this court with the opportunity to analyze the wisdom and efficacy of what has become known as the "independent business judgment rule." Petitioners argue the rule should not serve as bar to their tortious interference claim. They assert the rule discourages settlement, favors those who can afford to litigate and operates as a grant of absolution to tortfeasors. To the contrary, the City argues the independent business judgment rule is sound public policy especially in the context of land use permit cases and should not be abandoned by this court. We reject the "independent business judgment rule" and rely instead on traditional principles of proximate causation to determine whether the defendant is responsible for the injuries and damages suffered.
The "independent business judgment rule" has as its origin in this court's decision in King, 84 Wash.2d 239, 525 P.2d 228. In that case, the Kings brought a mandamus action to require the issuance of a street use and building permit by the City of Seattle. Judgment was entered directing issuance of the permit along with a finding that the prior action of the City in refusing the permit was arbitrary and capricious. Weeks prior to the issuance of the permits by the City, however, the United States Corps of Engineers changed its regulations and the Kings were required to make an application to the Corps. The Kings did not make an application to the Corps, but instead abandoned the project and quitclaimed their interest in the property. They sued the City, seeking damages and expenses for their lost profit. Id. at 242, 525 P.2d 228.
This court reversed the trial court's award of damages. It concluded that the City should not be subject to legal liability because the Kings "made no effort to exhaust their federal administrative remedies nor did they attempt to avoid their damages." Id. at 250, 525 P.2d 228.
Municipal liability for tortious interference with prospective economic advantage should not be premised on the independent unsubstantiated decision of a plaintiff that it would be unavailing to seek a possible administrative remedy accorded him under the law. If this were not so, the plaintiff would be able to create liability in another by his own independent judgment. We therefore find no legal liability (proximate cause) in the City for the plaintiffs' damages here.
Id. at 251, 525 P.2d 228. The court stated that the plaintiffs could not assert a claim for damages against the city where they had available to them, but refused to pursue, a legal remedy which "could have prevented all of their damages." Id. at 251, 525 P.2d 228 (emphasis added).
Addressing the Kings' contention that they did not apply for the federal permit because they did not have the economic resources to pursue the project, the court stated "[t]his was a voluntary business judgment." Id. at 251, 525 P.2d 228.
Since this court's decision in King, the development and application of the "independent business judgment rule" has occurred only in Division One of the Court of Appeals. See Hillis Homes, 32 Wash.App. 279, 647 P.2d 43; Grader, 53 Wash.App. 431, 767 P.2d 952; Marsh, 57 Wash.App. 610, 789 P.2d 792; Horn v. Moberg, 68 Wash.App. 551, 844 P.2d 452 (1993). Twice this court has been asked *228 to apply the "independent business judgment rule" and, although we have acknowledged the existence of the rule, we refused to apply it in both cases. See Pleas v. City of Seattle, 112 Wash.2d 794, 774 P.2d 1158 (1989); Stiley v. Block, 130 Wash.2d 486, 925 P.2d 194 (1996).
The "independent business judgment rule" was first applied by Division One in the land use context. In Grader, 53 Wash.App. 431, 767 P.2d 952, the City of Lynnwood approved a conditional use permit for Grader to build a billiard parlor/warehouse. The City also required Grader to obtain a building permit. Instead of applying for the building permit, Grader negotiated informally with the City and ultimately concluded that the City was not going to cooperate in issuing the building permit. Thereafter, Grader sued for damages and the jury returned a verdict in his favor. Id. at 434-36, 767 P.2d 952. Citing King, Division One reversed, finding that any loss was the result of Grader's independent business judgment. Id. at 441-42, 767 P.2d 952. The court found that Grader made a series of decisions which caused his injuries, the most important of which was his decision not to apply for a building permit at all. Thus, the court determined the City's actions were not the proximate cause of any damages suffered by Grader. See also Hillis Homes, 32 Wash.App. at 285, 647 P.2d 43 (citing King, 84 Wash.2d at 252, 525 P.2d 228, the court found the County's liability could not be "premised on the developer's independent business judgment that it would be more advantageous to informally work with the County rather than promptly pursuing its legal remedies....")
The "independent business judgment rule" has also been applied outside the land use context. In Marsh, 57 Wash.App. 610, 789 P.2d 792, Commonwealth, as escrow agent, recorded a deed of trust containing an incorrect legal description and rerecorded the deed within 90 days of the Marshes' filing for bankruptcy. The deed of trust was security for a major loan to the Marshes. The recording and rerecording created the possibility the rerecording could be voided as a preference in bankruptcy. This would result in the property in question becoming an asset in the bankruptcy. Faced with this risk, the Marshes paid $200,000 more in settlement of an unsecured creditor's claim than they could have settled for prior to the discovery of the Commonwealth's mistake. They then sued Commonwealth. Id. at 611, 789 P.2d 792.
The trial court awarded the Marshes $200,000 plus interest and found the rerecording was a voidable preference. The trial court awarded the Marshes damages on the theory that Commonwealth's actions had weakened the Marshes' negotiating position with the unsecured creditor and placed them in a "vulnerable legal position." Id. at 617, 789 P.2d 792.
Division One interpreted "vulnerable legal position" to mean no more than "a realistic possibility of an adverse decision." Id. at 617, 789 P.2d 792. The court concluded the Marshes had not suffered any legal damages from Commonwealth's mistake until they entered into the settlement with the unsecured creditor and found their decision to settle with the unsecured creditor was a matter of independent business judgment. Id. The court in Marsh interpreted King as holding that "where there is a realistic possibility of correcting the wrongful act complained of by pursuing available legal remedies, and the plaintiff by the voluntary exercise of independent business judgment elects not to pursue those available legal remedies, the defendant's wrongful act is not the proximate cause of the plaintiff's damages." Id. at 619-20, 789 P.2d 792.
Following Marsh, Division One applied the rule again in Horn, 68 Wash.App. 551, 844 P.2d 452. In this case, Horn, on the advice of counsel, concluded he probably would not prevail in his products liability claim. He dismissed his claim against the manufacturer, prompted by concerns that the manufacturer might obtain an award of attorney fees if the court concluded the lawsuit was frivolous. Id. at 555, 844 P.2d 452. Horn later filed a professional negligence action against the attorney, alleging the attorney had not properly prepared the case for trial. Horn prevailed at trial. Id. at 556, 844 P.2d 452.
Division One reversed the trial court, finding that even though Horn might have been influenced by counsel's representations, he *229 had nonetheless exercised independent business judgment. Id. at 559, 844 P.2d 452. The court stated that the threat of possible "financial repercussions [did] not prevent the Horns' dismissal ... from being intentional and voluntary." Id.
Recently, however, Division Three of the Court of Appeals has criticized the "independent business judgment rule" and declined to apply the rule in Flint v. Hart, 82 Wash.App. 209, 917 P.2d 590 (1996). In Flint, the law firm of Hart & Winfree assisted Mr. Flint in the sale of his funeral home business. The firm failed, however, to retain a security interest in the general intangibles for Mr. Flint. Only after the buyers sought bankruptcy protection did Mr. Flint learn he did not have a security interest in the business' general intangibles and consequently entered into a settlement agreement with the buyer. Mr. Flint thereafter brought a malpractice action against the firm and a jury returned a verdict in his favor. In its defense, the law firm argued that its negligence was not the proximate cause of Mr. Flint's damages because he exercised his independent business judgment when he settled his claim with the Myers. Id. at 211, 917 P.2d 590.
In its criticism of the "independent business judgment rule" the Court of Appeals states that the rule discourages settlement, noting that every decision to settle a lawsuit is an exercise of independent business judgment. Id. at 220, 917 P.2d 590. The court explained:
If applied categorically, the independent business judgment rule eliminates any potential for further negligence claims following settlement of a claim. In so doing, the rule discourages settlement, particularly in those cases in which the very predicament, which prompts settlement in the first place, is the result of another's negligence.... Many settlements are a reasonable response to a difficult situation created by another's negligence.
Id.
The court also expressed its concern that the rule favors litigants who have the financial ability to proceed with litigation. Id. The independent business judgment rule, the court states, "has the potential to discriminate against litigants who may be forced into early settlements because they cannot risk the cost and expense attendant with litigation." Id. Division Three proceeded to criticize the application of the rule in other cases.
The court disagreed with the holding in Marsh, noting the Marshes' "vulnerable legal position" was the result of a mistake made by Commonwealth. The court pointed out that, having been put into a difficult position, Marsh evaluated the risk that his note may be pulled into the bankruptcy proceeding as an unsecured asset and decided to settle. He may have prevailed, but "it is also possible that Marsh may not have prevailed, or [that he] may have prevailed at such a great expense that it would be a Pyrrhic victory." Id. at 219, 917 P.2d 590. Like the Marshes, the court points out that Horn was also put in a precarious position by the alleged negligence of others and concluded the wisest course of action was to dismiss the case. "The problem with ... the independent business judgment rule is that is does not accommodate those sound exercises of business judgment which result in settlements." Id. at 219-20, 917 P.2d 590.
Thus, the Court in Flint concluded that although Flint's settlement was an exercise of independent business judgment, "it may well have been a sound exercise of business judgment." Id. at 220, 917 P.2d 590. The court held that Mr. Flint's claim was not barred by the independent business judgment rule, adding that whether or not Flint was obligated to mitigate damages was a question for the jury. Id.
We find in analyzing the "independent business judgment rule" that it lacks clear origins. The court in King cites no authority for the assertion that a plaintiff's independent business judgment not to pursue a possible legal remedy will preclude a claim for damages. Additionally, we can find no other jurisdiction which has such a rule. In fact, the court in King did not intend to create a "independent business judgment rule," as such. As the dissent points out, the majority, in reality, denied liability because the *230 plaintiff failed to mitigate damages.[5]King, 84 Wash.2d at 254, 525 P.2d 228 (Brachtenbach, J., dissenting). Justice Brachtenbach asserted that the majority applied mitigation principles "under the guise of a policy consideration...." Id. (Brachtenbach, J., dissenting).
The Court of Appeals in Flint points out the circular reasoning used in King.
The mitigation of damages doctrine was inapplicable because the question of whether the Kings had a duty to mitigate presupposed that the City was legally liable for their damages in the first place. And legal liability never arose because the Kings, presumably in an attempt to mitigate their damages, decided to abandon the project.
Flint, 82 Wash.App. at 215, 917 P.2d 590 (quoting King, 84 Wash.2d at 251, 525 P.2d 228). Essentially, a mitigation requirement was imposed prior to a determination that a legal wrong had been committed.
Our main concern with this rule is some actions which could be labeled as an "independent business judgment" could also be valid attempts to mitigate damages. In many cases, a decision to withdraw from a lengthy administrative process or to settle a dispute is a reasonable attempt by the injured party to mitigate damages and would be recognized as such by the courts. However, it is the same decision which is labeled an "independent business judgment" and precludes injured persons from any possibility of recovery.
The rule also discourages settlements, contrary to the express public policy of this state which strongly encourages settlement. See e.g., Seafirst Ctr. Ltd. Partnership v. Erickson, 127 Wash.2d 355, 365, 898 P.2d 299 (1995) (the law "`strongly favors'" settlement) (quoting Seafirst Ctr. Ltd. Partnership v. Kargianis, Austin & Erickson, 73 Wash. App. 471, 476, 866 P.2d 60 (1994)); Kirk v. Moe, 114 Wash.2d 550, 554-55, 789 P.2d 84 (1990) ("`The settlement of a claimant's entire claim should be strongly encouraged'") (quoting Thomas V. Harris, Washington's Unique Approach to Partial Tort Settlements: The Modified Pro Tanto Credit and the Reasonableness Hearing Requirement, 20 Gonz. L.Rev. 69, 112 (1984-1985)). Every time a party settles a claim he or she is essentially making an independent business judgment which under the present rule would preclude any valid claim against a tortfeasor. Consequently, the rule promotes litigation and favors those with the means to do so.
Additionally, the rule has the potential to operate as an absolution to tortfeasors. The Court of Appeal's discussion in Flint explaining this concern is well taken. The court noted that in many cases the tortious acts of another necessitate a person's decision to remove themselves from a legal process, to settle a claim, to dismiss an action, etc. Flint, 82 Wash.App. at 218-19, 917 P.2d 590. The danger is that persons who have a valid legal injury are barred from the courtroom for a decision that was necessitated by the tortfeasor. Thus, the rule works as a potential shield from liability for tortfeasors favoring those that have unlimited financial capability to extend the legal process.
In fact, the majority in King recognized "the potential for abuse which legal process may serve in the hands of public officials, bankrolled with public funds, who seek to achieve by delay and the necessity for costly court suits or administrative hearings what they cannot achieve on the merits...." King, 84 Wash.2d at 252-53, 525 P.2d 228. This court also noted in Pleas when it declined to apply the "independent business judgment rule" that to require a developer to "appeal each additional requirement the City imposes in an effort to prevent legitimate development as soon as these are imposed *231 would sorely try the fortunes, let alone patience, of the wealthiest developer." Pleas, 112 Wash.2d at 808, 774 P.2d 1158. Where it can be shown that a city has delayed a process to the point that it is no longer feasible for the applicant to continue, the applicant should not be barred from asserting his or her legal claim because of a decision to withdraw from the process.
In summary, we find that the "independent business judgment rule," which rests on tenuous underpinnings, discourages settlement, favors those who can afford lengthy litigation, and serves as a potential shield from liability for those who would otherwise be found liable for a legal wrong.
Thus, we find that the "independent business judgment rule" can no longer serve as a bar to the proximate cause element of a legal claim.[6] We are not saying, as a matter of law, that a person's own conduct may not be the sole cause of his or her injuries, thus breaking the chain of causation. The court must decide based on traditional principles of proximate causation whether or not a defendant was the cause of the injuries suffered and whether the duty to mitigate was met. We reverse and remand the decision of the Court of Appeals.[7]
SMITH, JOHNSON, ALEXANDER and SANDERS, JJ., concur.
TALMADGE, Justice (dissenting).
The majority tries valiantly to make sense of the so-called "independent business judgment" rule, a defense we crafted in King v. City of Seattle, 84 Wash.2d 239, 525 P.2d 228 (1974), and Pleas v. City of Seattle, 112 Wash.2d 794, 774 P.2d 1158 (1989), to the cause of action for tortious interference we created for persons wrongfully denied land use permits by municipalities. I dissent from the majority opinion because I believe it does not go far enough. We should overrule King in its entirety.

FACTS
In 1987, the Blumes applied to the City of Seattle (Seattle) for a Master Use Permit (MUP) to construct a six-story office/research project, University Center Phase II. Phase I of this development in Seattle's University District generated substantial traffic problems and considerable community opposition. In response to the Blumes' application, Seattle determined there were significant environmental impacts requiring an Environmental Impact Statement (EIS). The Blumes did not appeal from Seattle's finding of environmental significance. Between 1987 and 1990, the Blumes worked on the draft and final EIS. The development of an EIS remained entirely in the hands of the Blumes, rather than Seattle. In July of 1990, Seattle's Department of Community and Land Use (DCLU) proposed a final decision that would have required the Blumes to mitigate the traffic problems as well as limit the height, bulk, and scale of the project. Anticipating community opposition, the Blumes met with neighborhood project opponents and negotiated with them between July of 1990 and May of 1992, when DCLU indicated it would issue a final draft of the proposed conditions for approval of the Blumes' MUP. A comment period on the final draft of the conditions was to take place until June 8, 1992, but the Blumes formally withdrew their application for a permit on June 2, 1992.
At no time between March of 1987 and June of 1992 did the Blumes file an action for a mandamus to force Seattle to issue the MUP.[1]
*232 Seattle sued the Blumes for back interest due on a loan the City made to the Blumes for construction of University Center Phase I. The Blumes answered Seattle's complaint and counterclaimed against Seattle under theories of violation of RCW 64.40 and tortious interference with a business expectancy. The trial court granted summary judgment to the City and the Court of Appeals affirmed the judgment.[2] The Court of Appeals noted the Blumes confused their RCW 64.40 theory with tortious interference, holding the Blumes did not state a claim under RCW 64.40 and their tortious interference claim was appropriately barred by the independent business judgment defense because of their delay in preparing the EIS, their negotiation with the opponents of the project, their failure to initiate any mandamus action to speed up Seattle's decisionmaking process, and their withdrawal of the permit application. City of Seattle v. Blume, No. 35597-0-I, slip op. at 4-8, 1996 WL 312500 (Wash.Ct. App.1996).

DISCUSSION
The Court of Appeals correctly affirmed the trial court's dismissal of the Blumes' RCW 64.40 claim; the Blumes did not bring their claim within the 30-day statutory limitation period. The majority appears to agree with the Court of Appeals on this point: although it does not say so explicitly, the majority implies as much in its discussion of why the RCW 64.40 time bar did not apply to the tortious interference claim. The Blumes have not petitioned for review of this issue. RAP 13.7(b).
The Court of Appeals also affirmed dismissal of the claim for tortious interference with a business expectancy because the Blumes exercised independent business judgment in deciding not to proceed with their MUP application. The majority disagrees, and reverses and remands the case for trial.
In so doing, the majority opinion discards the "independent business judgment" defense that emerged from King. I agree with the majority. The "independent business judgment" defense has no place in a field already fully occupied by the doctrine of avoidable consequences, in cases where liability exists (also called mitigation of damages), and by the necessity for proving the proximate cause element in every claim of tort.[3] Abandonment of the "independent business judgment" defense not only makes logical sense, but follows from our recent decision in Smoke v. City of Seattle, 132 Wash.2d 214, 228, 937 P.2d 186 (1997), where we equated the defense with proximate cause: "A plaintiff's voluntary or `business judgment' refusal to pursue a known legal remedy may save a defendant from liability by acting as the proximate cause of any damages."
However, the majority persists in believing King was correct in allowing a cause of action for tortious interference in the land use context although such a cause of action is a departure from any known formulation of the tortious interference cause of action. The Court then created the "independent business judgment" defense in King as jerry-rigging to prop up the theory of liability it created in that case. In King, the City of Seattle arbitrarily and capriciously refused to issue a street use permit for development of property along Lake Union. King obtained a writ of mandamus ordering issuance of the permit, and finally received the permit four months after he had applied for it. In the *233 interim, however, the Army Corps of Engineers changed a regulation to require a federal permit for the development King wanted to undertake. King asserted the federal permit could take up to two years to obtain. Br. of Resp'ts at 5 in King. King was unable to make the payments on his property for such a long period of time, and eventually ceased making payments on it, ultimately losing it. Had the City issued the street use permit to King at the time he had applied for it, he would not have had to comply with the new Corps of Engineers regulation, and allegedly would have been able to develop his property. He sued the City for the resulting damages, including the loss of his property and lost future profits. The trial court awarded King over $365,000.
King's legal theory of liability was nebulous. In his appellate brief, King cited a California case that held, "[W]here the law requires absolutely a ministerial act to be done by a public officer, and he neglects or refuses to do such act, he may be compelled to respond in damages to the extent of the injury arising from his conduct." Br. of Resp'ts at 17 (citing Ellis v. City Council, 222 Cal.App.2d 490, 35 Cal.Rptr. 317, 321 (1963)). The Court rejected this approach, holding instead "the tort complained of here is interference with prospective economic advantage." King, 84 Wash.2d at 247, 525 P.2d 228. The King Court then adopted the independent business judgment defense to mitigate the effect of the cause of action it created.[4]
We had earlier discussed the origins of the tort of interference with a business expectancy in a scholarly disquisition in Calbom v. Knudtzon, 65 Wash.2d 157, 161-62, 396 P.2d 148 (1964):
Intentional and unjustified third-party interference with valid contractual relations or business expectancies constitutes a tort, with its taproot embedded in early decisions of the courts of England, e.g.: Keeble v. Hickeringill, 11 East 574, 11 Mod. 74, 130, 3 Salk 9, 103 Eng. Rep. 1127 (1809); Lumley v. Gye, 2 El. & Bl. 216, 118 Eng. Rep. 749 (1853); Bowen v. Hall, 6 Q.B.D. 333, 50 L.J.Q.B. 305 (1881); Temperton v. Russell, 1 Q.B. 715, 62 L.J.Q.B. 412 (1893); South Wales Miners' Federation v. Glamorgan Coal Co., A.C. 239, 74 L.J.K.B. 525 (1905).
From and with the English decisions, the tort has become engraved upon American law, generally unsullied in principle, although with some case by case distinctions. See Carpenter, Interference with Contract Relations, 41 Harv. L.Rev. 728; Prosser on Torts (3d ed.) § 123, p. 950; 30 Am.Jur., Interference § 61, p. 95; 84 A.L.R. 43, 9 A.L.R. (2d) 228, 26 A.L.R. (2d) 1227.
We have recognized the tort in its various forms. Jones v. Leslie, 61 Wash. 107, 112 Pac. 81 (1910); Seidell v. Taylor, 86 Wash. 645, 151 Pac. 41 (1915); Pacific Typesetting Co. v. International Typographical Union, 125 Wash. 273, 216 Pac. 358, 32 A.L.R. 767 (1923); Sears v. International Brotherhood of Teamsters, Chauffeurs, Stablemen & Helpers of America, Local No. 524, 8 Wash.2d 447, 112 P.2d 850 (1941); Hein v. Chrysler Corp., 45 Wash.2d 586, 277 P.2d 708 (1954); Titus v. Tacoma Smeltermen's Union Local *234 No. 25, International Union of Mine, Mill & Smelter Workers, 62 Wash.2d 461, 383 P.2d 504 (1963).
The fundamental premise of the tort that a person has a right to pursue his valid contractual and business expectancies unmolested by the wrongful and officious intermeddling of a third partyhas been crystallized and defined in Restatement, Torts § 766, as follows:
"Except as stated in Section 698 [betrothal promises], one who, without a privilege to do so, induces or otherwise purposely causes a third person not to
"(a) perform a contract with another, or
"(b) enter into or continue a business relation with another is liable to the other for the harm caused thereby."
Clause (a) relates to those cases in which the purposeful interference of a third party induces or causes a breach of an existing and valid contract relationship. Clause (b) embraces two types of situations. One is that in which the interferor purposely induces or causes a party not to enter into a business relationship with another. The second is where a business relationship, terminable at the will of the parties thereto, exists, and the intermeddler purposely induces or causes a termination of such relationship. The distinction between the situations propounded by clauses (a) and (b) lies not so much in the nature of the wrong, as in the existence or nonexistence, and availability as a defense, of privilege or justification for the interference. Restatement, Torts § 766, Comment c.
The tort of interference with a business expectancy requires a third party. "An action for tortious interference with a contractual relationship lies only against a third party. A party to the contract cannot be liable in tort for inducing its own breach." Olympic Fish Prods., Inc. v. Lloyd, 93 Wash.2d 596, 598, 611 P.2d 737 (1980) (citing Hein v. Chrysler Corp., 45 Wash.2d 586, 277 P.2d 708 (1954), and Houser v. City of Redmond, 16 Wash.App. 743, 559 P.2d 577 (1977), aff'd, 91 Wash.2d 36, 586 P.2d 482 (1978)). There is no third party in the case at bar. The only parties are Seattle and the Blumes. Even if one gets past the rather peculiar idea that Seattle, by receiving an application for a Master Use Permit from the Blumes, was somehow creating a business expectancy, Seattle cannot be liable for inducing its own breach.
Although Hein had been on the books for 20 years, the King Court erroneously failed to take it into account. In a case where only two parties are involved, such as a city and an applicant for some city service or amenity, there can be no tortious interference with a business expectancy. To the extent King holds as much, we should overrule it and cases like Pleas that rely on it.
The Court in King created a theory of liability in an apparent effort to give the Kings a remedy for the wrongful actions of a municipality in the land use context. This was in 1974, well before the advent of regulatory takings jurisprudence. Today, in addition to a constitutional regulatory takings claim, parties like the Blumes have state statutory remedies in both RCW 64.40[5] and the Land Use Petition Act. RCW 36.70C. They also can pursue a claim under 42 U.S.C. § 1983. It is therefore no longer justifiable to sustain and perpetuate a cause of action that exists in open hostility to other holdings of this Court.

CONCLUSION
Here, the Blumes had a perfectly adequate remedy at law for the City's alleged improper actions in delaying the MUP permit, i.e., RCW 64.40, or perhaps 42 U.S.C. § 1983. Unfortunately for them, they did not file their claim under RCW 64.40 until after the statutory limitation period had run and chose to forgo a § 1983 claim.
We should now abolish not only the defense (independent business judgment), but also the tort that should never have been (tortious interference as formulated in King) where clearer remedial schemes such as RCW 64.40 and other statutory provisions *235 exist. I would affirm the decisions of the Court of Appeals and the trial court.
DURHAM, C.J., and DOLLIVER and GUY, JJ., concur.
NOTES
[1] Three separate projects, commonly referred to as "University Center Phase I" were developed on the southern portion of the block. The Blumes were responsible for one project, the remodel of the University Chevrolet showroom into retail space. The largest development in University Center Phase I was a theater/office complex developed by Salmon Bay Development Corp. and managed by Theater Arts Group. The final piece was a small Italian trattoria and sidewalk cafe known as Stellas. The Blumes were not involved in the development of these projects and likewise had no control over their management.
[2] Bruce Blume states that the studies proposed by Transpo, but rejected by the City in September 1997, for the University Center project were identical to those approved for nearby projects such as the Armada-Langerquist development at 4225 Roosevelt Way NE., two blocks from University Center.
[3] The City did correspond with the two neighborhood groups, both of which opposed the Phase II development largely because of alleged ongoing violations concerning the Phase I development. In a letter dated September 22, 1988, the DCLU stated "[w]e will not issue a permit for Phase II of the project until we are satisfied that Phase I is in compliance with its permit requirements." See Clerk's Papers at 313. The Blumes contend, however, that even after the City acknowledged that the Phase I problems had been brought into compliance in April 1989, the City continued to delay the permitting process and final approval of the final EIS until January 1990.
[4] Community Development Block Grant loans, obtained at no cost to the City from the United States Department for Housing and Urban Development upon the City's showing that the developer's proposal meets the relevant criteria, are loaned at a below-market interest rate in return for the developer's agreement to utilize all interest savings realized thereby to develop neighborhood amenities and public improvements which would otherwise never be constructed or which would have to be developed with public funds.
[5] The court in King v. City of Seattle, 84 Wash.2d 239, 525 P.2d 228 (1974), also indicates a failure to exhaust administrative remedies. However, the discussion regarding a failure to exhaust was in regard to the court's overall finding that the Kings failed to do all that they could to avoid their damages. The court found that, because they failed to continue with the federal application and because they failed to attempt to sell their property, they were the cause of their own damages. There is no real failure to exhaust in King as there was no administrative decision to appeal. The court was simply indicating that they were required to pursue legal processes that could mitigate their injuries.
[6] We are not deciding the merits of the Blumes' tortious interference claim. Issues concerning whether a tortious interference lies against the City in this case are not before the court on review and have not been briefed by the parties.
[7] Additionally, we deny the City's motion to modify the Clerk's ruling striking portions II.A and II.B of the City's supplemental brief as the issues raised by the City were not before this court on review. See RAP 13.7(b) (on appeal to the Supreme Court the scope of review is limited to those "questions raised in ... the petition for review and the answer....")
[1] A mandamus action is available in land use actions to force a municipality to process an application and issue a land use permit. See Hillis Homes, Inc. v. Snohomish County, 32 Wash.App. 279, 647 P.2d 43 (1982); Norco Constr., Inc. v. King County, 97 Wash.2d 680, 649 P.2d 103 (1982); Pleas v. City of Seattle, 112 Wash.2d 794, 774 P.2d 1158 (1989).
[2] The Blumes have not petitioned this Court for review of the Court of Appeals decision that they did not have a claim under RCW 64.40. Moreover, the Blumes never sought a claim against the City under 42 U.S.C. § 1983. The Blumes' only theory for recovery, which was substantially intertwined with their theory under RCW 64.40, is tortious interference by Seattle with a business expectancy.
[3] Contrary to the dissent in King, the "independent business judgment" defense cannot be analogized to mitigation of damages, because there is no requirement to mitigate damages when the tort is intentional. Desimone v. Mutual Materials Co., 23 Wash.2d 876, 884, 162 P.2d 808 (1945); Champa v. Washington Compressed Gas Co., 146 Wash. 190, 201, 262 P. 228 (1927). Interference with a business relationship is an intentional tort. Calbom v. Knudtzon, 65 Wash.2d 157, 161, 396 P.2d 148 (1964). See Sunland Invs., Inc. v. Graham, 54 Wash.App. 361, 365, 773 P.2d 873 (1989).
[4] The King court formulated the defense as follows:

Municipal liability for tortious interference with prospective economic advantage should not be premised on the independent unsubstantiated decision of a plaintiff that it would be unavailing to seek a possible administrative remedy accorded him under the law. If this were not so, the plaintiff would be able to create liability in another by his own independent judgment. We therefore find no legal liability (proximate cause) in the City for the plaintiffs' damages here.
King, 84 Wash.2d at 251, 525 P.2d 228. The rule has been reaffirmed in Hillis Homes, Inc., 32 Wash.App. 279, 647 P.2d 43; Grader v. City of Lynnwood, 53 Wash.App. 431, 767 P.2d 952, review denied, 113 Wash.2d 1001, 777 P.2d 1050, cert. denied, 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 193 (1989). The defense has also been extended to cases of professional liability. Marsh v. Commonwealth Land Title Ins. Co., 57 Wash.App. 610, 789 P.2d 792, review denied, 115 Wash.2d 1025, 802 P.2d 127 (1990); Horn v. Moberg, 68 Wash.App. 551, 844 P.2d 452, review denied, 121 Wash.2d 1025, 854 P.2d 1085 (1993). Recently, Division Three of the Court of Appeals criticized the extension of the independent business judgment defense to professional liability cases. Flint v. Hart, 82 Wash.App. 209, 917 P.2d 590 (1996).
[5] It is noteworthy that RCW 64.40.030, like the independent business judgment defense, requires a claimant to exhaust his or her administrative remedies.