[No. 23188-3-II. Division Two. January 14, 2000.]

ROBERT D. LAYMON, ET AL., *Appellants*, v. THE DEPARTMENT OF NATURAL RESOURCES, ET AL., *Respondents*.

---

520

*Thomas Charles Althauser* of *Olson, Althauser, Lawler & Samuelson*, for appellants.

*Christine O. Gregoire, Attorney General*, and *John Edward Justice, Assistant*, for respondents.

SEINFELD, J. — Robert and Pamela Laymon sued the

Washington Department of Natural Resources (DNR), the Washington Department of Fish and Wildlife (DFW), and the State of Washington (collectively the State) alleging that administrative negligence led to the failure of the Laymons' real estate development project. The trial court granted summary judgment to the State. Because the Laymons failed to exhaust their administrative remedies before filing suit, we affirm.

## FACTS

The Laymons own forested land near Kalama. They planned to develop a residential housing tract on the property and, in July 1993, filed the necessary forest practices application with DNR.

The DNR paperwork included a State Environmental Policy Act[1] environmental checklist wherein the Laymons indicated that there were no threatened or endangered species on or near their property. The Laymons claim that they went over the checklist with Lloyd Handlos, DNR forest practices coordinator, who gave them this information.

In August 1993, Kenneth Nimmo, an adjacent landowner who opposed the Laymons' development plans, reported to DFW the existence of a bald eagle nest on his property. He said that the pair of eagles residing therein had produced eaglets for the past three years. DFW confirmed the nest report, apparently relying mainly on Nimmo's description of it.

DNR approved the Laymons' application in September 1993. And the Laymons began logging operations in late December 1993.

On January 13, 1994, DNR forester Joel Rogauskas learned of the reported eagle nest. He then observed the nest with a DFW biologist who purportedly said "that it was possible the nest was used by an eagle."

[1]RCW 43.21C.

On January 18, 1994, Rogauskas served the Laymons with a stop work order, alleging that the Laymons were conducting "[l]ogging within 1/4 mile of a recently discovered bald eagle nest site." The stop work order required the Laymons to "[s]top immediately all forest practice work within 1/4 mile of the known bald eagle nest . . . until a bald eagle management plan is written and approved by . . . DFW." The order then carried the following notice:

> The operator, timber owner or forest landowner may appeal this Stop Work Order to the Forest Practices Appeals Board. (See Title 223 WAC.) To be valid, any such appeal must be filed within fifteen (15) calendar days of 2/3/94 Date of Service. If an appeal is filed, you may request immediate relief from this Stop Work Order from the Forest Practices Appeals Board. The Stop Work Order must be complied with immediately, whether or not an appeal is filed. CONTACT Southwest Region Office with any questions, phone (206) – 577 – 2025.

Clerk's Papers at 43.

Robert Laymon asked Rogauskas about filing an appeal with the Forest Practices Appeals Board (the Board). According to Laymon, Rogauskas responded that such an appeal would be outside the Board's jurisdiction because the stop work order concerned a bald eagle management plan, which was within DFW's control, not DNR's. A day or so later, Robert Laymon called the Southwest Region Office of DNR and spoke to region manager Jan Gano, one of Rogauskas' supervisors. Robert Laymon stated that Gano confirmed that an appeal would be useless because the Board would not act in a situation requiring a bald eagle management plan. Subsequently, the Laymons never filed an appeal with the Board.

About 10 days after DNR issued the stop work order, DFW presented the Laymons with a draft bald eagle management plan that contained significant restrictions on development. The bald eagle management plan also stated that DFW could review and amend the plan pursuant to WAC 232-12-292.

The Laymons insisted there could be no bald eagles on or

adjacent to their property and refused to sign the plan. Nonetheless, when the Laymons' financial backers learned about the terms of the plan, they withdrew from the project. In June 1994, DFW determined that the bald eagle nest "never existed" and deleted it from its database.

In 1995, a certified specialist in avian ecology carried out a detailed examination of the suspected eagle's nest and concluded that the nest was most likely that of a squirrel. In the expert's opinion, "a person knowledgeable and experienced in the identification of bald eagle nests who observed the nest on the Nimmo property would not have concluded that it was a bald eagle's nest."

In 1997, the Laymons filed a claim in negligence against DFW, DNR, and the State. The complaint included a claim for negligent investigation against DFW.

The State moved for summary judgment, arguing that (1) the Laymons failed to exhaust administrative remedies, (2) the public duty doctrine precluded liability for breach of a duty to the Laymons as individuals, (3) the Laymons failed to mitigate their damages, and (4) Washington courts do not recognize a claim for negligent investigation. The trial court granted the motion, reasoning that the Laymons failed to exhaust their administrative remedies. The Laymons appeal.

## DISCUSSION

When reviewing a grant of summary judgment, we engage in the same inquiry as the trial court. *Bishop v. Miche*, 137 Wn.2d 518, 523, 973 P.2d 465 (1999). Summary judgment is proper where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Id.* at 523; *Taggart v. State*, 118 Wn.2d 195, 199, 822 P.2d 243 (1992). We consider the facts and reasonable inferences from the facts in the light most favorable to the nonmoving party. *Bishop*, 137 Wn.2d at 523;

*Taggert*, 118 Wn.2d at 199. And we review questions of law de novo. *Bishop*, 137 Wn.2d at 523.

## I. EXHAUSTION OF ADMINISTRATIVE REMEDIES

■ The State claims that the trial court properly granted summary judgment because the Laymons did not appeal to the Board before filing the action. Thus, they failed to exhaust available administrative remedies.[2] Nor did they seek DFW review of the bald eagle management plan. The Laymons respond, citing *Concerned Land Owners v. King County*, 64 Wn. App. 768, 777, 827 P.2d 1017 (1992), that the State is equitably estopped from asserting their failure to exhaust administrative remedies.[3]

It is well settled that a party aggrieved by governmental action must exhaust all available administrative remedies before filing suit. *See CLEAN v. City of Spokane*, 133 Wn.2d 455, 465, 947 P.2d 1169 (1997), *cert. denied*, 525 U.S. 812, 119 S. Ct. 45, 142 L. Ed. 2d 35 (1998); *Smoke v. City of Seattle*, 132 Wn.2d 214, 223-24, 937 P.2d 186 (1997). "Where an agency has an appeal procedure in place, an aggrieved person is required to seek redress under that procedure before seeking judicial review." *CLEAN*, 133 Wn.2d at 465. Where, as here, the aggrieved party fails to show that it attempted to use the appropriate administrative appeals pro-

---

[2]WAC 223-08-085(3) states:

> An operator, timber owner or forest landowner subject to a stop work order (RCW 76.09.080) may commence an appeal to the appeals board within fifteen days after service upon the operator. (*See* RCW 76.09.080(2)(d)).

WAC 223-08-087 provides in pertinent part:

> Any operator, timber owner, or forest land owner appealing under RCW 76.09.080 may seek temporary discontinuance of the stop work order, in whole or in part, pending such appeal.

An aggrieved party may seek superior court review of a decision of the forest practices appeals aboard. RCW 76.09.230(5); WAC 223-08-260.

[3]The Laymons also argue that the trial court incorrectly applied the law of equitable estoppel. That claim is irrelevant as the trial court's findings of fact and conclusions of law on summary judgment "are superfluous and will not be considered on appeal." *Concerned Coupeville Citizens v. Town of Coupeville*, 62 Wn. App. 408, 413, 814 P.2d 243 (1991); *Donald v. City of Vancouver*, 43 Wn. App. 880, 883, 719 P.2d 966 (1986).

cess, the trial court may properly dismiss the claim. *Id.*

Moreover, a government defendant's claim that a plaintiff failed to exhaust administrative remedies before filing a tort action is really a question of proximate cause. *Wolfe v. Bennett PS&E, Inc.*, 95 Wn. App. 71, 81 n.7, 974 P.2d 355, *review denied*, 139 Wn.2d 1003 (1999). Proximate cause consists of cause in fact and legal causation. *City of Seattle v. Blume*, 134 Wn.2d 243, 251, 947 P.2d 223 (1997); *Harley v. State*, 103 Wn.2d 768, 777, 698 P.2d 77 (1985).

■ "Legal causation rests on policy considerations determining how far the consequences of a defendant's acts should extend." *Blume*, 134 Wn.2d at 252; *Wolfe*, 95 Wn. App. at 81. A court "must decide based on traditional principles of proximate causation whether or not a defendant was the cause of the injuries suffered and whether the duty to mitigate was met." *Blume*, 134 Wn.2d at 260. Consequently, a plaintiff's failure to employ available legal remedies to avoid resulting damages is analogous to a failure to mitigate damages.[4] *See id.*

■ ■ A party claiming equitable estoppel against the government bears a most heavy burden. *See, e.g., Department of Ecology v. Theodoratus*, 135 Wn.2d 582, 599, 957 P.2d 1241 (1998). "Equitable estoppel against the government is not favored." *Id.* at 599 (citing *Kramarevcky v. Department of Soc. & Health Serv.*, 122 Wn.2d 738, 743, 863 P.2d 535 (1993)).

For equitable estoppel to apply, the Laymons must prove: "(1) an admission, statement or act inconsistent with a claim later asserted; (2) reasonable reliance on that admission, statement, or act by the other party; and (3) injury to the relying party if the court permits the first party to contradict or repudiate the admission, statement or act." *Theodoratus*, 135 Wn.2d at 599 (citing *Berschauer/Phillips*

---

[4] In this connection, we consider the State's argument that the Laymons failed to mitigate their damages as more properly addressed within the exhaustion of remedies issue. Thus, we do not separately analyze mitigation of damages.

*Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 831, 881 P.2d 986 (1994)). The claimant must prove each element by clear, cogent, and convincing evidence. *Theodoratus*, 135 Wn.2d at 599; *Kramarevcky*, 122 Wn.2d at 744.

Here, the State denies the Laymons' allegation that DNR employees told Robert Laymon it would be futile to appeal the stop work order. In response to Robert Laymon's affidavit, the State contends that the conflict in evidence is immaterial because the alleged statements pertained to questions of law, which precludes application of equitable estoppel. *See Concerned Land Owners*, 64 Wn. App. at 778.

■ "[W]here the representations allegedly relied upon are matters of law, rather than fact, equitable estoppel will not be applied." *Theodoratus*, 135 Wn.2d at 599-600 (citing *Concerned Land Owners*, 64 Wn. App. at 778). Here, Rogauskas' statement involved a clear matter of law, the jurisdiction of the Board. *See Equity Group, Inc. v. Hidden*, 88 Wn. App. 148, 153, 943 P.2d 1167 (1997) (noting that subject matter jurisdiction is a question of law). Consequently, that statement cannot form a foundation for a claim of equitable estoppel. *See Theodoratus*, 135 Wn.2d at 600.

■ Further, although Gano's alleged statement that the Board will not act in a situation involving a bald eagle management plan could refer to law or fact, this issue is not dispositive because the Laymons have not shown that their reliance on the statement was reasonable.[5] *Concerned Land Owners*, 64 Wn. App. at 778; *Marashi v. Lannen*, 55

---

[5]The Laymons cite *Shafer v. State*, 83 Wn.2d 618, 521 P.2d 736 (1974) to support their argument that Gano made a factual assertion. There the court found estoppel to apply when a state attorney told a claimant to wait before filing a claim. *Id.* at 624. But *Shafer*, the first Washington case to apply equitable estoppel against the state, applied different standards. 83 Wn.2d at 623. The *Shafer* court did not discuss whether the state agent's statement was legal or factual in nature, and it did not apply a clear and convincing standard of evidence. 83 Wn.2d at 623-24. A dissenting justice argued for a stricter standard. *Id.* at 626 (Stafford, J., concurring in part, dissenting in part). Later, the Supreme Court adopted a clear, cogent, and convincing standard, *see Theodoratus*, 135 Wn.2d at 599, and a determination as to whether the claimed statement was factual or legal in nature, *see id.* at 599-600. Consequently, we do not believe that the *Shafer* holding controls

Wn. App. 820, 824, 780 P.2d 1341 (1989). Reasonableness is founded on the notion that the party claiming estoppel did not know the true facts and had no means of discovering them. *Chemical Bank v. Washington Pub. Power Supply Sys.*, 102 Wn.2d 874, 905, 691 P.2d 524 (1984); *Concerned Land Owners*, 64 Wn. App. at 778; *Marashi*, 55 Wn. App. at 824-25. The Laymons produced no evidence indicating that they could not obtain better information about the administrative appeals process; both the stop work order and the bald eagle management plan cited the applicable chapters of the Washington Administrative Code (WAC). The Laymons did not state that they were unable either to find the applicable statutes and rules or to retain an attorney to assist them. Consequently, the equitable estoppel claim fails for lack of reasonable reliance. *See Concerned Land Owners*, 64 Wn. App. at 778.

Moreover, DNR's representations and the text of the bald eagle management plan itself provided clear notice that other administrative remedies were then available. Under WAC 232-12-292(5.2.2), DFW could modify the plan in response to "changing eagle and landowner circumstances." And WAC 232-12-292(7.1, 7.2)[6] allows the landowner to refer the plan to the bald eagle oversight committee if the landowner and DFW do not agree as to an acceptable plan

these facts today. Similarly, the Laymons' reliance on *Harbor Air v. Board of Tax Appeals*, 88 Wn.2d 359, 366-67, 560 P.2d 1145 (1977), is not persuasive.

[6]WAC 232-12-292 (7.1) states:

The department, the landowner and the permitting agency shall work to develop a mutually agreeable site management plan within 30 days of the original notice to the department of game. This plan shall become a part of the application for a permit.

WAC 232-12-292 (7.2) states:

Should agreement not be reached, the landowner may refer the site management plan to the bald eagle oversight committee (paragraph 8). The committee shall have 30 days from the date contacted to bring about agreement among the department, the landowner, and the permitting agency. The committee may use conciliation, mediation and factfinding, or any other method they deem appropriate to bring about a mutually acceptable resolution of the issues.

within 30 days. Finally, the aggrieved landowner may initiate a formal administrative appeal. WAC 232-12-292(7.4).[7]

■ "Where the record fails to show that an aggrieved party has attempted to use the administrative appeals process, the court will conclude that no appeal was made." *CLEAN*, 133 Wn.2d at 465 (citing *Citizens for Clean Air v. City of Spokane*, 114 Wn.2d 20, 27, 785 P.2d 447 (1990)). Apart from the Laymons' brief contacts with Rogauskas and Gano, they made no effort to challenge administratively either the stop work order or the bald eagle management plan. Thus, the trial court did not err in determining that the Laymons failed to pursue available administrative remedies and, consequently, did not err in granting summary judgment. *CLEAN*, 133 Wn.2d at 465.

## II. PUBLIC DUTY DOCTRINE

Even assuming that the Laymons' lawsuit was not barred by exhaustion requirements, the public duty doctrine would preclude their negligence claim. The Laymons contend that they had a special relationship with the State that the State breached. But we agree with the State that the Laymons have failed to show a prima facie case of a special relationship.

---

[7] WAC 232-12-292 (7.4) states:

The landowner may initiate a formal appeal of the department of game's decision. Formal appeal procedures appear in WAC 232-12-197.

Although DFW repealed WAC 232-12-197 effective January 30, 1998, the DFW regulations still reference the procedures set forth in the repealed provision. WAC 232-12-292(7.4). Consequently, it is currently less clear how a landowner initiates a formal appeal of a DFW decision. But at the time DFW issued the bald eagle management plan affecting the Laymons, the remedies set forth under former WAC 232-12-197 were available.

WAC 232-12-197(3) provides for appointment of a hearing examiner and scheduling of hearings. Former WAC 232-12-197(4) (repealed 1998) stated:

A hearing examiner will take evidence and otherwise conduct a hearing. Upon receipt of all proof and argument, written findings of fact, conclusions of law and proposed order will be issued by the examiner, with copies mailed to each party and attorney of record, if any.

"The director's decision is a final decision for purposes of appeal to the superior court pursuant to RCW 34.04.130." Former WAC 232-12-197(5) (repealed 1998).

■ "It is axiomatic that to maintain a negligence action a duty of care running from the defendant to the plaintiff must be shown." *Honcoop v. State*, 111 Wn.2d 182, 188, 759 P.2d 1188 (1988). When a plaintiff alleges a government agency's liability, the court "employ[s] the 'public duty doctrine' to determine whether the duty is owed to a nebulous public or whether that duty is owed to a particular individual." *Id.* at 188. "The public duty doctrine provides that regulatory statutes impose a duty on public officials which is owed to the public as a whole, and that such a statute does not impose any actionable duty . . . to a particular individual." *Id.* (citing *Bailey v. Town of Forks*, 108 Wn.2d 262, 265-66, 737 P.2d 1257, 753 P.2d 523 (1987); *Chambers-Castanes v. King County*, 100 Wn.2d 275, 284, 669 P.2d 451, 39 A.L.R.4TH 671 (1983)).

■ There are several exceptions to the public duty doctrine. *Meaney v. Dodd*, 111 Wn.2d 174, 178, 759 P.2d 455 (1988); *Bailey*, 108 Wn.2d at 268. The "special relationship" exception, claimed by the Laymons, is a "focusing tool" that we use to determine whether the government owes a general duty to the public or whether that duty is focused on the plaintiff.[8] *Meaney*, 111 Wn.2d at 178; *Taylor v. Stevens County*, 111 Wn.2d 159, 166, 759 P.2d 447 (1988). To establish a special relationship, the plaintiff must show (1) some form of privity or direct contact between the government agency and plaintiff that sets the plaintiff apart from the general public; (2) the agency gave the plaintiff specific assurances that resulted in the agency undertaking a duty; and (3) the plaintiff justifiably relied upon those assurances. *Id.* at 166. If a plaintiff makes this showing, the "government then owes the plaintiff a duty of due care to ensure that the assurances given are correct." *Meaney*, 111 Wn.2d at 179.

---

[8]In their opposition to summary judgment, the Laymons asserted that an administrative appeal would be futile. *See Orion Corp. v. State*, 103 Wn.2d 441, 457, 693 P.2d 1369 (1985) (noting that court does not require exhaustion of administrative remedies if resort to such remedies would be futile). The Laymons apparently have abandoned that theory on appeal.

Here, the Laymons merely showed that they had direct contact with Landros, Rogauskas, and Gano; they did not provide meaningful argument as to the specific duties allegedly created by these officials' statements or brief the elements of a negligence claim. *Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290, *review denied*, 136 Wn.2d 1015 (1998) (passing treatment of issue or lack of reasoned argument insufficient for judicial review). Consequently, we decline to review this issue further.

### III. NEGLIGENT INVESTIGATION

In addition to the exhaustion and public duty theories, the Laymons fail to show a right to recover on a negligent investigation theory. The Laymons, citing *Babcock v. State*, 116 Wn.2d 596, 610, 809 P.2d 143 (1991), claim in their reply brief that DFW personnel had a statutorily derived duty to investigate the claimed bald eagle's nest and that this duty is analogous to that of Department of Social and Health Services (DSHS) personnel. Although we ordinarily do not review an issue first set forth in a reply brief, we will examine it here briefly as the Laymons argued this theory to the trial court and the State raises it in its response brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

A claim of negligent investigation will not lie against police officers. *Fondren v. Klickitat County*, 79 Wn. App. 850, 862, 905 P.2d 928 (1995); *Donaldson v. City of Seattle*, 65 Wn. App. 661, 671, 831 P.2d 1098 (1992); *Dever v. Fowler*, 63 Wn. App. 35, 44-45, 816 P.2d 1237, 824 P.2d 1237 (1991). But the courts have recognized a claim of negligent investigation against DSHS caseworkers. *Babcock*, 116 Wn.2d at 610; *Lesley v. Department of Soc. & Health Serv.*, 83 Wn. App. 263, 273, 921 P.2d 1066 (1996); *Dunning v. Pacerelli*, 63 Wn. App. 232, 238-40, 818 P.2d 34 (1991). Policy considerations and duties arising from common law and statutes determine whether the courts will recognize a claim of negligent investigation in a given context. *See Lesley*, 83 Wn. App. at 273.

▮▮▮ The Legislature has declared that "the protection of the bald eagle is consistent with a societal concern for the perpetuation of natural life cycles, the sensitivity and vulnerability of particular rare and distinguished species, and the quality of life of humans." LAWS OF 1984, ch. 239, § 1. In line with this concern, the Legislature directed DFW to "adopt and enforce necessary rules defining the extent and boundaries of habitat buffer zones for bald eagles." RCW 77.12.655.

In response, DFW has adopted the following rules:

> The department's goal shall be to identify, catalog and prioritize eagle nesting or roost sites. The department shall facilitate landowner notification that nesting or roost sites exist on their property and work with landowners to develop a nesting or roost site description.

WAC 232-12-292(4.3).

> When a proposed land-use activity involves land containing or adjacent to an eagle nest or communal roost, the permitting agency shall immediately notify the department of game of the permit application.

WAC 232-12-292(4.4).

> When the department determines that a proposed activity would adversely impact eagle habitat, a department representative shall meet on-site with the landowner and, where applicable, a representative of the permitting agency, to discuss management options for the protection of eagle habitat. The purpose of these discussions shall be to reach agreement on a site management plan for bald eagle habitat protection.

WAC 232-12-292(4.5).

Insofar as the foregoing statutes and regulations require DFW to identify and catalog eagles nests, the law imposes upon the agency a limited investigatory function. This investigatory function is a prerequisite to any cognizable claim of negligent investigation. *See Babcock*, 116 Wn.2d at 610. But without a more specific statutory provision, this

general reference to an investigative function is insufficient to create an affirmative duty to investigate that is enforceable in tort. *See Lesley*, 83 Wn. App. at 273 (noting that RCW 26.44.050 places affirmative duty on DSHS to investigate allegations of child abuse).

The relevant DFW statutes and rules do not impose on DFW an affirmative duty to verify alleged eagle nest sightings on behalf of potentially affected landowners. Further, creating tort liability for failure to investigate an initial sighting could interfere with DFW's mandate to protect a "particular rare and distinguished species." RCW 77.12.650. Although DFW must consider affected landowners, the potential of paying damages for stopping the destruction of reported but unverified eagle habitat could chill DFW's zealous performance of its statutory mandate thereby allowing the destruction to occur. Verification then would be futile.

Thus, public policy considerations as well as the statutory language are inconsistent with the recognition of a negligent investigation claim in this context. Rather, as we discussed above, there are administrative remedies available to the property owner: negotiation of a bald eagle plan with the agency, review by the bald eagle oversight committee, and a formal appeal. WAC 232-12-292(7.1, 7.2, 7.4) The Laymons are not entitled to damages because they chose to ignore these remedies.

For the foregoing reasons, the trial court did not err in granting summary judgment to the State. Consequently, we affirm.

ARMSTRONG, A.C.J., and HUNT, J., concur.