[No. 56415-3-I.   Division One.   October 23, 2006.]

TERRY R. SMITH, *Appellant*, v. PRESTON GATES ELLIS, L.L.P.,
ET AL., *Respondents*.

*Robert B. Gould*, for appellant.

*Stephen R. Sirianni* and *Jonathan P. Meier* (of *Sirianni Youtz Meier & Spoonemore*), for respondents.

¶1 APPELWICK, C.J. — Terry Smith brought a legal malpractice case for negligence relating to the construction contract on his "dream home." He contends that if defendants had informed him of the risks of the contract, he would not have entered into the contract and would not have experienced cost overruns, delays, and alleged contractor malfeasance. The trial court granted summary judgment to defendants Preston Gates Ellis, L.L.P., and Tom Wolfendale (collectively, Preston) because plaintiff failed to provide evidence of proximate causation. We affirm.

## FACTS

¶2 Terry Smith established the credit department and hired and supervised the credit collection staff at Preston Gates Ellis, L.L.P. He worked at Preston for 14 years before retiring in February 2000. In 1996, Smith began thinking about building his "dream home." He found a site for the home and purchased 37 acres on Kitsap Peninsula in 1998. The same year, he engaged contractor Dan Hosfeldt and his company Olympic Timber Builders to build a small cabin on the property on the footprint of an existing shed. To this end, he and Hosfeldt verbally agreed on a "cost plus" arrangement where Smith would pay the cost of the materials and labor plus an additional 20 percent. Hosfeldt completed the project in the spring of 1999 for approximately $100,000, which was above the estimated price of $75,000 for the cabin. By October 1998, Smith had orally agreed to engage Hosfeldt as the contractor on a "cost plus" basis for the building of his "dream home." Pursuant to this oral agreement, Hosfeldt began site work, including tearing down the existing home and installing a new septic system in late 1998. On January 15, 1999, Smith signed a contract with Pioneer Log Homes for a log cabin home without consulting an attorney. He paid approximately $200,000 for the log shell. Hosfeldt was to interact with Pioneer Log Homes to build the structure and apply the log shell. The

final, written contract with Hosfeldt for construction of the main home was not signed until May 15, 1999.

¶3 In mid-January 1999, Smith received a separate "cost plus" contract from Hosfeldt covering construction of the main house and he took the contract to his former employers at Preston for help in evaluating the terms. He spoke with partner Robert Jaffe who recommended Tom Wolfendale. Jaffe told Smith that Wolfendale had been the lawyer for Bill Gates III on his Medina home. Smith took the contract to Wolfendale and requested his assistance. He told Wolfendale, "I'm going to be building this home. I want to make sure I'm protected." Wolfendale apparently reviewed the contract and engaged in some negotiation with Hosfeldt's attorney, Steve Dixon. He devoted about six hours of work to the project before he told Smith the contract was ready. Smith reviewed and signed the contract on May 15, 1999.

¶4 Unfortunately, Smith encountered serious trouble during the construction of his "dream home." The project greatly surpassed Smith's desired budget. In addition, he concluded that his contractor was engaged in fraud and overbilling. Smith discovered that an employee, Blaine Lee, had been fired by Hosfeldt after he asked for a raise. Upon speaking with Lee, Smith learned that Lee was being paid $20 per hour instead of the contractually stipulated price of $35 per hour. He then hired his attorney, James Oliver, and they determined that Hosfeldt was paying the employees less than the agreed rates and keeping the difference. Smith eventually fired Hosfeldt and employed another contractor to complete the project. At the same time, Smith encountered significant financial losses on his investments as a result of the technology stock collapse. By the time of its completion, the "dream home" had become a nightmare that had consumed most of Smith's resources, leaving him unable to afford to live in it. In 2004, Smith sold the home and property for over $4.1 million.

¶5 Smith sued his contractor, alleging fraud, overbilling, unnecessary construction, and negligent construction. Even

though his attorney James Oliver thought that the case was probably a winner and that many of the claims would have been covered by the insurance, Smith settled. The decision to settle was prompted by Hosfeldt's limited corporate and personal assets, limited insurance coverage of the claims, Smith's ill health, the trauma and risk of going to trial, and inability to incur more legal costs. Smith spent approximately $150,000 in legal fees on this suit but eventually settled for $60,000 on the advice of his attorney, who advised him that the settlement was reasonable. Smith then sued Preston, alleging legal malpractice, claiming if he had known about the risks inherent in the contract he would never have signed and would not have encountered the problems he faced in building his "dream home." He claimed a minimum of $1,776,000 in economic damages arising from the negligent representation.

## ANALYSIS

¶6 When reviewing a summary judgment order, the appellate court undertakes the same inquiry as the trial court. *Thompson v. Peninsula Sch. Dist. No. 401*, 77 Wn. App. 500, 504, 892 P.2d 760 (1995). Summary judgment is proper when there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c). The moving party bears this burden of proof. *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989). "A material fact is one upon which the outcome of the litigation depends." *Barrie v. Hosts of Am., Inc.*, 94 Wn.2d 640, 642, 618 P.2d 96 (1980). The nonmoving party cannot rely on speculation but must assert specific facts to defeat summary judgment. *Seven Gables Corp. v. MGM/UA Entm't Co.*, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). All facts and inferences are considered in the light most favorable to the nonmoving party. *Ashcraft v. Wallingford*, 17 Wn. App. 853, 854, 565 P.2d 1224 (1977). In this case, the facts and inferences should be construed in Smith's favor.

¶7 Legal malpractice requires a showing of (1) the existence of an attorney-client relationship giving rise to a

duty of care to the client, (2) act or omission in breach of the duty, (3) damages to the client, and (4) proximate causation between the breach and damages. *Sherry v. Diercks*, 29 Wn. App. 433, 437, 628 P.2d 1336 (1981). For the purposes of summary judgment, Preston conceded the issues of duty and breach of duty, and brought the motion based on causation.

¶8 In a legal malpractice case, the burden is on the plaintiff to show that the attorney's negligence was the proximate cause of the injury. *Hansen v. Wightman*, 14 Wn. App. 78, 88, 538 P.2d 1238 (1975). Proximate causation has two elements: cause in fact and legal causation. *City of Seattle v. Blume*, 134 Wn.2d 243, 251, 947 P.2d 223 (1997). "Cause in fact refers to the 'but for' consequences of an act, that is, the immediate connection between an act and an injury." *Id.* at 251-52. Legal causation is based on policy considerations determining how far the consequences of an act should extend. *Id.* Proximate cause is determined by the "but for" test. *Griswold v. Kilpatrick*, 107 Wn. App. 757, 760, 27 P.3d 246 (2001). The plaintiff must demonstrate that "but for" the attorney's negligence he would have obtained a better result. *Sherry*, 29 Wn. App. at 438. Proximate cause is usually the province of the jury. *Brust v. Newton*, 70 Wn. App. 286, 291-93, 852 P.2d 1092 (1993). However, the court can determine proximate cause as a matter of law if "reasonable minds could not differ." *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999).

¶9 To complete a prima facie case for legal malpractice and survive summary judgment, Smith needs to show the deficiencies caused the harm. Smith needs to demonstrate that a better contract or full disclosure would have prevented the injury or improved his recovery. Smith points to several deficiencies in the construction contract to support his malpractice claim. The contract was a "cost plus" contract without a guaranteed price ceiling, there was no provision allowing for audits of the contractor's records, it did not require a personal guaranty from the company owner, it did not specify the luxury quality of workmanship

desired, and the required insurance and contractor bonds were insufficient. However, he fails to demonstrate that "but for" these deficiencies in the contract he would have had a better result.

¶10 The only clear evidence of causation came from the declaration of Mr. Miles Stanislaw, the plaintiff's negligence and standard of care expert. After indicating specific deficiencies in the contract, he stated, "it is highly unlikely that Mr. Smith or any reasonabl[y] prudent person would have signed this construction agreement had the contract's numerous deficiencies and risks been adequately and accurately explained in writing." The trial court struck this sentence as testimony outside Mr. Stanislaw's disclosed area of expertise. Without this testimony tying the alleged deficiencies to the damages, nothing in the record establishes causation.

¶11 Smith states that he "believe[s] categorically and unequivocally that had Mr. Wolfendale advised [him] of any of the numerous problems, shortcomings and inadequacies in this contract [,he] would never have signed it." Smith could not specifically identify an alternative that would have led to a better outcome. "I can't tell you what I would have done but I would not have entered into this contract." He could only speculate that he might have looked for another builder but that he was committed to building his "dream home." Smith cannot rely on such speculation to defeat summary judgment. *Seven Gables Corp.*, 106 Wn.2d at 13. He must present specific facts to rebut Preston's claims. *Id.* Smith's conjectures do not rise to the level of fact and specificity necessary to prevent summary judgment.

## A. The "Cost Plus" Provision

¶12 The contract proposed by Hosfeldt provided for payment of the cost of materials and labor plus 20 percent but did not include a price ceiling or guaranteed maximum price. Smith had engaged in previous discussions with Hosfeldt and Pioneer Log Homes about his budget, and they had concluded that $275 per square foot was a reasonable

maximum price for the luxury home Smith envisioned. Smith had provided this information to Wolfendale, but the figure was not included in the contract. Smith recognized that the contract did not contain this maximum amount. "I remember reviewing the contract and noticing that was not in the contract." Despite this knowledge, he signed the contract. Smith testified that he would not have signed the contract if Preston had advised him that there was a risk that the cost of construction could exceed the $275 per square foot he had set as the outer limit of his budget. However, while he may not have expected to pay the final total of $365 per square foot, Smith understood that the contract did not specify his desired maximum price and he "didn't expect [the $275 per square foot figure] to be a commitment. It was the best judgment of [his] meeting with Alpine Log Homes." And, Smith had substantial knowledge about the risks of a "cost plus" contract.

> Q: You recognized when you signed the contract with him, the May 1999 contract for the big house, that cost plus entailed some risk to you?
>
> Smith: I thought it was fairly clear.
>
> Q: But you knew that he would pass through his costs even if they were higher than you anticipated?
>
> Smith: I was supposed to see copies of the invoices.

He also had experience with the risks of such a contract. Before Smith took the contract for the main house to Preston, Hosfeldt had built Smith's cabin on the property on a cost plus basis. Smith had initially estimated $75,000 for the construction of the cabin, but the final cost was closer to $100,000. Smith had already experienced a cost overrun of a third with the same contractor. Smith had firsthand knowledge of the risk of cost overruns and knowledge that the cap discussed with Hosfeldt and the log home providers was neither expected to be relied on nor included in the contract. Nothing in the record supports Smith's contention that if Wolfendale had cautioned him about these same risks, Smith would not have signed the

contract. Nothing in the record supports a bare allegation of causation based on Wolfendale's failure to repeat the known risks.

B. Audit Provision, Insurance, Personal Guaranty, Contractor Bond, and Luxury Standards

¶13 Smith contends that the lack of an audit provision was another contractual deficiency. However, the record contains no evidence concerning how the missing audit provision impacted the ability to obtain financial information or otherwise contributed to the harm suffered. When Smith became concerned that Hosfeldt was padding the employee pay rates, he requested the payroll records. Hosfeldt initially refused to disclose the information, so Smith immediately made an appointment with Oliver, who "insisted . . . on receiving copies of the payroll records." Smith and Oliver were apparently able to obtain the information after this demand. Smith also examined bills through which he monitored the cost of the project and was able to question Hosfeldt about the expenditures. In fact, he had a discussion with Hosfeldt about a major bill for an unauthorized subbasement as a direct result of this monitoring. The only evidence in the record demonstrates that Smith received access to the financial information during the construction when he or Oliver demanded. Even if the data was not turned over in a timely fashion, the record contains no contentions or evidence that the delay in that instance caused any harm. The lack of an audit provision cannot support the causation claim without specific negative impact to Mr. Smith's access and use of the financial information.

¶14 The inadequate insurance provision also has no explicit link to the contractor problems or diminished recovery. In fact, the attorney in the contractor litigation concluded that the insurance coverage would probably have paid the costs to repair defective workmanship, work done by subcontractors, consequential damages from the defec-

tive work, and resulting delay. Testimony from Oliver alluded to "items . . . not covered, arguably, under insurance" as a consideration for accepting the settlement, but Smith provides no evidence as to those items not covered and the impact on his recovery. While insufficient insurance may have diminished the recoverable losses, mere speculation that items may not have been covered does not rise to the level of fact and specificity necessary to prevent summary judgment on causation. Appellant needed to have submitted some evidence of the extent of the loss rendered unrecoverable by the inadequate insurance provided for in the construction contract. Here, appellant did not exhaust the coverage that was available.

¶15 The insurance at issue did not cover fraud and overbilling. These claims would have been separately recoverable against the contractor. Oliver testified as to evidence of at least $70,000 in improper billing for materials, supplies, and rental equipment that represented a solid claim against the contractor. A judgment on these claims would be satisfied through the contractor's assets. Without a personal guaranty, Smith could not collect against Hosfeldt personally but was limited to the assets of the limited liability company (L.L.C.).

¶16 When he signed the contract, Smith knew the contractor was an L.L.C. and understood that the owners of an L.L.C. are not personally liable for the L.L.C.'s obligations without a personal guaranty. Oliver mentioned that the lack of a personal guaranty created a "practical impediment in the sense of the collectibility issue." Smith testified that when thinking about settling, he considered the fact that the Hosfeldts and their company appeared to have limited assets to satisfy a judgment. These statements demonstrate knowledge of the risk of signing a contract with an L.L.C. and without a personal guaranty. But, Smith provides no evidence that the absence of a guaranty caused any of his losses, such as information about the financial status of either the L.L.C. or Hosfeldt. The allegation that a guaranty from Hosfeldt would have improved recovery is speculative without evidence that the L.L.C. had inadequate

assets and that Hosfeldt had personal assets capable of satisfying all or a portion of the judgment.

¶17 The same problem holds true for the contractor bond issue. The testimony demonstrates that the contract only required a $6,000 bond on a $3,000,000 construction project. Oliver mentions the inadequate performance bond as another impediment to collecting on a possible judgment and as a factor in the decision to settle. However, "mere allegations" are not sufficient to ward off summary judgment. CR 56(e). The record does not include factual information demonstrating how the amount of the bond limited the overall recovery. Without specific facts about the negative role the insufficient bond played in the recovery, Smith does not create the causal link needed for malpractice.

¶18 Finally, the allegation that the failure of the contract to specify a luxury building standard caused the losses faces the same problem. Expert testimony stated that the contract was deficient without this standard, but the record fails to show how the lack of the luxury building standard negatively impacted his outcome during construction or subsequent litigation. Smith did not provide evidence that the missing luxury standard caused the shoddy workmanship, impaired his ability to prove the extent of his loss, or decreased his recovery. Without a specific connection to the harm suffered, the lack of a luxury standard has not demonstrated a "but for" causal link to Smith's damages.

¶19 Smith has alleged numerous deficiencies, and the proffered testimony reflects that the contract was poorly drafted. However, Preston admitted that it fell short of the duty owed to the client for the purpose of summary judgment. Causation of damages was at issue, not breach of duty. Smith's legal malpractice claim must fail because he does not show that his results would have been better "but for" the shortcomings of the contract. The record contains only vague allegations that the deficiencies of Preston's representation impacted Smith's recovery and speculation as to alternative courses of action. Smith himself admits that contract shortcomings were not the only reasons be-

hind his decision to settle with the contractor, citing his health and inability to fund continued litigation as significant factors. When he testified about alternative approaches he would have taken if Preston had counseled him as to the defects in the contract, Smith stated, "I at that point would have probably sought another builder, probably reviewed the whole project. I can't tell you what I would have done, but I would not have entered into this contract." While this is undoubtedly true, such speculation does not demonstrate that "he . . . would have achieved a better result had the attorney not been negligent." *VersusLaw, Inc. v. Stoel Rives, L.L.P.*, 127 Wn. App. 309, 328, 111 P.3d 866 (2005). Without such evidence, there is no prima facie case for causation. A legal malpractice case cannot survive summary judgment without such a showing. We therefore affirm the trial court's grant of summary judgment to the defendants.

BECKER and DWYER, JJ., concur.

Review denied at 161 Wn.2d 1011 (2007).