2007 WY 60

Alan J. VEYS, individually and d/b/a Lone Eagle Resorts, Inc., an Alaska corporation, and d/b/a Pybus Point Lodge, LLC, a Washington limited liability company; and Alan J. Veys Properties, LLC, a Washington limited liability company, Appellants (Defendants),

v.

Marvin N. APPLEQUIST; Val B. Jones; Bruce F. Reed; and Pybus Alaska Resorts, LLC, a Wyoming limited liability company, Appellees (Plaintiffs).

No. 06–161.

Supreme Court of Wyoming.

April 13, 2007.

Representing Appellants: Larry B. Jones of Simpson Kepler & Edwards, LLC, a division of Burg Simpson Eldredge Hersh & Jardine, P.C., Cody, Wyoming; Diane Vaksdal Smith of Burg Simpson Eldredge Hersh & Jardine, P.C., Englewood, Colorado. Argument by Ms. Smith.

Representing Appellees: Mark W. Gifford, Casper, Wyoming; Darin B. Scheer of Bjork Lindley Little, P.C., Lander, Wyoming. Argument by Mr. Gifford.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1]   Marvin N. Applequist, Val B. Jones, Bruce F. Reed, and Pybus Alaska Resorts, LLC (collectively referred to as Buyers) filed suit against Alan J. Veys, individually and d/b/a Lone Eagle Resorts, Inc., Pybus Point Lodge, LLC, and Alan J. Veys Properties, LLC (collectively referred to as Sellers) for breach of an agreement to sell a fishing lodge business in Alaska. After a trial, the jury determined Sellers had breached the agreement and awarded Buyers a total of $3,000,000 in damages, including $471,676 in past damages and $2,528,324 in future damages. Sellers appeal alleging several errors with respect to the future damages award. Finding no error, we affirm.

## ISSUES

[¶ 2]   Sellers present the following issues for our review:

1. The trial court improperly denied Appellants' motion for a directed verdict at the close of Appellees' case-in-chief, because Appellees did not proffer any admissible or relevant evidence in support of the claim for "future damages."

2. The trial court erred in permitting the jury to determine the claims for "future damages" because of a lack of sufficient, competent evidence.

3. The jury's verdict awarding $2,528,324.00 in future damages is not

supported by sufficient, competent evidence.

4. The trial court erred in denying the Appellants' post-trial motions, seeking to set aside the jury's verdict for "future damages."

Buyers phrase the issues differently:

1. Were the trial court's decisions to (i) deny Appellants' motion for a directed verdict regarding future damages, (ii) allow the jury to determine Appellees' claim for future damages, and (iii) deny Appellants' post-trial motions seeking to set aside the jury's verdict for future damages, supported by substantial evidence where unrefuted evidence regarding gross profits, expenses, and net revenues established mathematical parameters that reasonably permitted the jury to find as they did, particularly where Appellants' misconduct prevented the ascertainment of future damages with additional precision?

2. Did a reasonable basis exist for the jury's award of future damages based upon testimony by a prior prospective purchaser and by Appellee Reed regarding future profits, together with documentary evidence and testimony from Appellant Veys himself regarding future profits, particularly where Appellants' misconduct prevented the ascertainment of future damages with additional precision?

## FACTS

[¶ 3] Sellers own a fishing lodge business called the Pybus Point Lodge, located on Admiralty Island in Alaska. The business includes both real and personal property. Mr. Applequist and Mr. Veys had been friends for some time, and in 2002, Mr. Veys told Mr. Applequist he was considering selling the lodge. Mr. Applequist had previously visited the lodge and expressed an interest in purchasing it. Mr. Applequist approached various people, including Mr. Reed, who had extensive business experience and owned considerable property, and Mr. Jones, who had experience as a hunting guide, about joining him in purchasing the lodge. The individual buyers were residents of Wyoming, and their limited liability company was formed in Wyoming prior to commencement of this action.

[¶ 4] In early 2004, the parties began in earnest to negotiate a sales agreement. They were represented by counsel and the negotiations were conducted in person, through e-mail and on the telephone. Mr. Applequist, who was employed as the executive vice-president of the Wyoming Farm Bureau Federation (Farm Bureau), told Mr. Veys that, if the transaction was going to occur, the parties needed to reach an agreement by June 3, 2004, because he was meeting with the Farm Bureau board of directors on that day and planned to either resign to run the lodge or recommit to his position. While Mr. Applequist was at that meeting, Mr. Veys agreed to the terms of the sales agreement. Mr. Applequist's attorney notified him of Mr. Veys' acceptance, and he resigned from his job.

[¶ 5] The purchase and sale agreement (PSA) was a lengthy, detailed document, incorporating various deadlines and contingencies. The agreed sales price was $2,650,000 in cash. The parties specifically chose Wyoming as the forum for any dispute arising from the agreement, but elected to apply Alaska procedural and substantive law to any such dispute.

[¶ 6] The PSA contemplated incorporation of numerous exhibits and schedules, including a legal description of the real property to be conveyed, lists of assets to be retained by Sellers and to be conveyed to Buyers, and an allocation of the purchase price between real and personal property for tax purposes. The parties were unable to reach an agreement on all of the exhibits prior to signing the PSA, so it included a provision allowing the parties until June 18, 2004, to do so. The exhibit deadline was subsequently extended to July 23, 2004, but that date also passed without agreement as to the exhibits. The PSA stated, in the event the parties were unable to agree on replacement exhibits, Buyers could remit a $50,000 deposit and elect to be bound by the exhibits the parties had originally agreed upon.

[¶ 7] In addition, the PSA included contingencies which had to be met or Buyers would be allowed to terminate the agreement without penalty. One of those contingencies pertained to the profitability of the business. Because Buyers did not have a clear understanding of the finances of the business prior to signing the agreement, the PSA included a contingency allowing Buyers to assess the financial health of the business during the 2004 fishing season. If the 2004 net profits, as calculated using a specific definition in the PSA, did not exceed $331,000, then Buyers had the option of terminating the agreement. Under the terms of the PSA, should Buyers agree the contingencies had been satisfied or to waive them, they could, at any time on or before October 1, 2004, elect to continue with the contract, in which case closing would occur as soon as possible after October 1, 2004, but no later than December 31, 2004. If the transaction closed, the effective date of the contract would be May 1, 2004, and Buyers would be entitled to retain the net profits for the 2004 season.

[¶ 8] Mr. Veys also agreed not to compete with the lodge business and to act as a consultant to Buyers for a period of time after closing. Mr. Applequist and Mr. Jones planned to spend the 2004 summer at the lodge, learning the business and finalizing the exhibits to the PSA. However, very soon after the parties signed the PSA, Mr. Veys began expressing seller's remorse. Over the summer, the relationship between the parties deteriorated. On August 27, 2004, Buyers' attorney sent a letter to Sellers' attorney electing for Buyers to be bound by the initial exhibits because the parties had been unable to agree on replacement exhibits; asking for wire transfer instructions so they could tender the $50,000 deposit; giving notice of Mr. Veys' noncompliance with the PSA because he failed to allow Buyers access to information about the lodge business; and demanding Sellers cure their noncompliance. Sellers' attorney responded with a letter on September 1, 2004, asserting the

parties did not have an enforceable agreement and demanding that Mr. Applequist and Mr. Jones leave the lodge. They complied with that demand.

[¶ 9] After returning to Wyoming, Buyers gave Sellers notice of their election to proceed with the purchase and tendered the $50,000 deposit by check because Sellers did not provide wire transfer instructions. Mr. Veys refused the deposit and again asserted the parties had not entered into an enforceable agreement. Buyers filed suit, advancing claims for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, anticipatory repudiation and specific performance (although Buyers eventually dropped that claim). Consistent with their earlier position, Sellers defended by arguing the parties' agreement was not sufficiently definite to be enforceable.

[¶ 10] The district court conducted a jury trial from December 5 through December 12, 2005. At the close of Buyers' case-in-chief, Sellers moved for a directed verdict and the district court denied their motion.[1] During the trial, Mr. Veys unexpectedly admitted the parties had entered into an agreement. The jury determined the parties had entered into an enforceable contract; Sellers breached the contract; and Buyers were entitled to past damages of $471,676 and future damages of $2,528,324.

[¶ 11] Sellers filed motions to set aside the jury's verdict, for a new trial and for remittitur. They argued the evidence was insufficient to support the damages awarded by the jury and the jury had acted under the influence of prejudice and passion. The district court denied Sellers' post-trial motions, and they appealed to this Court.

## STANDARDS OF REVIEW AND PROCEDURAL LAW

■ ■ [¶ 12] Under Alaska law,[2] claims of error in denial of a motion for a directed

---

1. The argument on Sellers' motion for a directed verdict took place during a break in Mr. Veys' testimony in Buyers' case-in-chief. The district court took the motion under advisement, allowed Buyers to finish their case, and then denied Sell-

ers' motion when they renewed it after Buyers rested.

2. The PSA stated: "This Agreement shall be governed by and construed in accordance with the

verdict or a judgment notwithstanding the verdict are reviewed on appeal with the same standards utilized by the trial court in making its determination on the motions. We employ the following standard:

"[O]n review of motions for directed verdict or for judgment notwithstanding the verdict, [our role] is not to weigh conflicting evidence or judge the credibility of witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the nonmoving party, is such that reasonable [jurors] could not differ in their judgment."

*Hahn v. Russ,* 611 P.2d 66, 67 (Alaska 1980), quoting *City of Whittier v. Whittier Fuel & Marine Corp.,* 577 P.2d 216, 220 (Alaska 1978), overruled on other grounds by *Native Alaskan Rec. & Pest Control v. United Bank Alaska,* 685 P.2d 1211 (Alaska 1984). *See also, Chenega Corp. v. Exxon Corp.,* 991 P.2d 769, 794 (Alaska 1999); *Kay v. Danbar, Inc.,* 132 P.3d 262, 269 (Alaska 2006); *John Q. Hammons Inc. v. Poletis,* 954 P.2d 1353, 1356 (Wyo.1998).

[¶ 13] Similarly, using Alaskan law, we review the sufficiency of the evidence to support the district court's decision to give jury instructions on a party's theory of the case, by applying the same standard utilized by the trial court. We consider "whether the facts and resulting inferences are such that reasonable people, viewing the evidence in the light most favorable to the party seeking the instruction could justifiably have different views on the question." *Bailey v. Lenord,* 625 P.2d 849, 855 (Alaska 1981), quoting *Godfrey v. Hemenway,* 617 P.2d 3, 7–8 (Alaska 1980). *See also, Rittierodt v. State Farm Ins. Co.,* 3 P.3d 841, 843 (Wyo.2000).

[¶ 14] The district court's decision on a motion for a new trial is, however, subject to less stringent review. The decision of whether or not to grant a new trial after a jury verdict rests in the trial court's discretion. *Bailey,* 625 P.2d at 856.

If there was an evidentiary basis for the jury's decision, the denial of a new trial must be affirmed. On the other hand, where "the evidence to support the verdict was completely lacking or was so slight and unconvincing as to make the verdict plainly unreasonable and unjust," a reversal of a denial of a new trial is proper. Finally, in reviewing the denial of a motion for a new trial, we must view the evidence in the light most favorable to the nonmoving party.

*Lamer v. McKee Indus., Inc.,* 721 P.2d 611, 613 (Alaska 1986) quoting *Clark v. City of Seward,* 659 P.2d 1227, 1230 (Alaska 1983) (other citations omitted). *See also, Reeves v. Alyeska Pipeline Serv. Co.,* 56 P.3d 660, 668 (Alaska 2002) and *Jensen v. Fremont Motors Cody, Inc.,* 2002 WY 173, ¶ 11, 58 P.3d 322, 326 (Wyo.2002).

[¶ 15] With regard to a motion for remittitur, the following standard applies:

Remittitur is only proper when a jury returns an otherwise proper verdict awarding an amount of damages that the evidence cannot reasonably support. We may not use remittitur to reduce an award below the maximum possible award sustainable by the evidence.

*Reeves,* 56 P.3d at 668. *See also, Texas West Oil & Gas Corp. v. Fitzgerald,* 726 P.2d 1056 (Wyo.1986).

**DISCUSSION**

[¶ 16] All of the issues presented by Sellers pertain to the future damages awarded to Buyers. It is appropriate, therefore, to start our discussion with a review of Alaska law pertaining to contract damages, in general, and future damages resulting from breach of contract, in particular. The goal in any breach of contract case is to arrive at a damages award which places "the nonbreaching party in as good a position as if the contract had been fully performed." *Central Bering Sea Fishermen's Ass'n v. Anderson,* 54 P.3d 271, 278 (Alaska 2002).

procedural and substantive laws of the State of Alaska." On appeal, Buyers and Sellers agree there is little difference between Wyoming and Alaska law on the issues presented here. However, because the parties specifically elected to

apply Alaska procedural and substantive law to their dispute, we cite primarily to Alaska law in resolving this case, but, when appropriate, we note similar Wyoming law.

[A] plaintiff alleging breach of contract must present evidence sufficient to calculate the amount of the loss caused by the breach. *City of Palmer v. Anderson*, 603 P.2d 495, 500 (Alaska 1979). The plaintiff "need not prove the amount of damages with exact detail, but the evidence must be sufficient to provide a reasonable basis for the jury's determination." *Id.*

*Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 636 (Alaska 1996). The "reasonable basis" requirement also applies to claims for future damages, including future lost profits, resulting from breach of a contract. *See Central Bering Sea*, 54 P.3d at 279, n. 20; *Alaska Children's Servs., Inc. v. Smart*, 677 P.2d 899, 902 (Alaska 1984); *Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 376–78, 47 S.Ct. 400, 71 L.Ed. 684 (1927) (holding that loss of anticipated profits may be recovered when the amount of the loss is reasonably certain and past profits are relevant evidence in forecasting future profits).

■ [¶ 17] Sellers contend the district court erred by 1) refusing to grant their motion for a directed verdict on the issue of future damages; 2) instructing the jury on the Buyer's claim for future damages; and 3) denying their post-trial motions for a judgment notwithstanding the verdict, new trial and/or remittitur. As is apparent from the standards of review and procedural law recited above, the determinations of whether Sellers were entitled to a directed verdict or judgment notwithstanding the verdict on the future damages issue and whether the jury should have been instructed on the law of future damages implicate similar analyses under Alaska law. All three questions require a determination of whether there was sufficient evidence of future damages to justify submission of the issue to the jury. This inquiry only considers whether there was evidence of any future damages; it is not concerned with the amount of the damages awarded by the jury. Applying the appropriate standard, we conclude Buyers presented ample evidence to warrant allowing the jury to decide whether they had suffered future damages resulting from Sellers' breach.

■ [¶ 18] The law specifically allows calculation of future lost profits damages by looking at the past profits of an on-going business. *See, e.g., Eastman Kodak*, 273 U.S. at 376–78, 47 S.Ct. 400; *City of Palmer v. Anderson*, 603 P.2d 495, 500 (Alaska 1979). In this case, Sellers had operated the fishing lodge business for many years. The evidence established that the lodge's gross revenues totaled approximately $1,000,000 in 2004. Mr. Reed testified Sellers gave him a list of reservations for 2004, showing reservations valued at $995,692. The list was admitted into evidence at trial as Plaintiff's Exhibit No. 11. In addition, Mr. Reed stated that, during the summer of 2004, Mr. Veys called and told him the lodge business had reached $1,000,000 in reservations for the season. Tonk Fisher, Sellers' accountant, told Mr. Reed the reservations reflected the lodge's income.

■ Arthur Thompson, who was also negotiating with Mr. Veys to purchase the lodge business, testified at trial about his knowledge of the business's expenses. He stated Mr. Veys told him the business expenses totaled approximately $550,000 per year. The $550,000 expense amount was confirmed by Mr. Veys in some handwritten notes which were admitted into evidence at trial. Mr. Veys testified the number was his "guesstimate" of the 2004 expenses.[3] Taking total revenues of $1,000,000 and deducting expenses of $550,000 results in a net annual profit for the lodge business of $450,000.

[¶ 20] An accountant, who appeared on behalf of Buyers at the trial, calculated the net profits for the lodge business in 2004 as $471,676. In arriving at the $471,676 net profits value, the accountant used the definition of net profits set forth in the PSA. The accountant testified the net profits definition was unique to the PSA and did not necessarily follow IRS or generally accepted accounting practice definitions. His calculation was, however, very similar to the net profits value calculated from other sources. The jury awarded past damages to Buyers consistent

---

**3.** Mr. Veys' testimony about his handwritten notes occurred during Buyers' case-in-chief, but after Sellers argued their motion for a directed verdict. *See* n. 1, *supra.*

with the accountant's calculation of net profits, and Sellers do not contest that award. These facts provide sufficient assurance that the lodge business could be reasonably expected to generate at least $450,000 in net profits each year for the foreseeable future.

[¶ 21] In addition to the anticipated lost profits, evidence was presented indicating Buyers would have substantial equity in the property upon completion of the sale. An appraisal ordered by Mr. Thompson was received into evidence at trial and indicated the value of the business, including the real and personal property, was $2,850,000. The parties in this case had agreed on a cash purchase price of $2,650,000. Using the appraised value, Buyers would have acquired $200,000 in equity if Sellers had not breached the agreement, which they could have realized in a future sale of the property. Buyers presented the lost profits and equity evidence in their case-in-chief and that evidence was, therefore, considered by the district court when it ruled on Sellers' motion for a directed verdict. There is simply no question that Buyers' future damages claim was supported by sufficient evidence to justify giving the jury instructions on, and allowing it to consider, the issue.[4] Moreover, the same evidence also justified the district court's decision to deny Sellers' motion for a judgment notwithstanding the verdict.

[¶ 22] The issues of remittitur and whether a new trial is warranted require a determination of whether the trial evidence supported the *amount* of future damages awarded to Buyers by the jury. The district court refused Sellers' invitation to interfere with the jury's future damages verdict, reasoning:

> Without speculating on how the jury reached its award, it is clear from the evidence and testimony of Mr. Veys, Mr. Reed and/or Mr. Thompson the jury could have found future damages in the amount awarded. Thompson, Reed and Veys all

testified that profits from the lodge would generally be about $450,000 per year. There was no time limit on how long those profits may be generated into the future. The jury was told the Plaintiffs must mitigate their losses and discount to present value the damage award. The jury was also told they could not speculate. The Court must assume the jury followed its instructions. Certainly given the amount of future profits, discounted at some rate, taken together with mitigation factors would have allowed the jury to award the future damages in the amount of $2,528,024.00.

> The Court must conclude that there were mathematical parameters established by the witnesses that would reasonably permit the jury to find as they did. If it could be argued that there were difficulties in determining the amount of future damages, such difficulties were attributable almost exclusively to the Defendant[s'] breach. Nevertheless, the Court must conclude, given competent testimony about yearly ... profits, that there was sufficient evidence for the jury to enter the verdict which they did.

[¶ 23] The trial court had discretion in ruling on the motion for a new trial. If the evidence, when viewed in the light most favorable to the jury's verdict, supports denial of the new trial motion, we will defer to the trial court's decision. *Bailey*, 625 P.2d at 856. Remittitur of an amount awarded by a jury is justified only when the evidence cannot reasonably support the verdict. *Reeves*, 56 P.3d at 668.

[¶ 24] As we stated earlier, there was evidence indicating the lodge business earned $450,000 per year in net profits. Mr. Reed testified that Buyers expected to operate the lodge at full capacity for at least seven years. Using the $450,000 profit figure and multiplying it by seven years, results in future lost profits of $3,150,000.[5] In addition, it was

---

4. Sellers' complaints about the future damages jury instructions pertain to the sufficiency of the evidence to support giving the instructions. They do not object to the wording or law set forth in the jury instructions. Consequently, it is unnecessary to set forth the substance of the instructions here.

5. The appellate record does not include the parties' closing arguments, but Buyers' counsel stated at oral argument in this Court that he presented several possible scenarios of future damages to the jury, with seven years of future lost profits falling in the middle of those alternatives. Coun-

undisputed Buyers would have acquired substantial equity in the property which could have been realized in a future sale and that value could have also been included by the jury in its future damages award. The district court instructed the jury to discount any future damages it chose to award to a present value. The jury's award of $2,528,324, which is less than seven years of future profits, indicates the instructions were followed.

[¶ 25] On appeal, Sellers contend that the future damages award was improper because it did not take into account Buyers' costs to service the debt, and Buyers did not meet their burden of proving their future damages were reasonable because they did not present evidence of the costs of financing. The financing or "debt service" cost is an expense which would, presumably, reduce the net profits of the business. The effect of the cost of financing on Buyers' future damages involved factual determinations, and it was the jury's responsibility to sort through the evidence presented by the parties. The PSA was not contingent upon Buyers obtaining financing. Consequently, even if Buyers had been unable to obtain a loan for the purchase, they were obligated to honor the agreement and would lose their $50,000 deposit if they were not capable of fulfilling their obligations. This fact suggests Buyers had the financial ability to fulfill their obligations under the PSA without obtaining financing. In this regard, Mr. Reed testified he had significant personal assets which the jury could have reasoned were potentially available to either purchase the lodge property outright or offset some of the costs of financing.

[¶ 26] We recognize some evidence presented at trial indicated Buyers were considering financing at least part of the purchase. Mr. Reed testified the $331,000 net profit contingency figure was based upon rough estimates of the debt service costs for financing a large portion of the $2,650,000 purchase price. The record does not indicate Sellers explored the costs of financing in any detail

either by cross-examination of Buyers' witnesses or presentation of evidence of their own.

■■■ [¶ 27] Sellers argue it was Buyers' responsibility to present sufficient evidence of the costs of debt service to satisfy their burden of proof on damages. We do not agree. 22 Am.Jur.2d *Damages* § 708 (2003), explains the parties' respective burdens of proof regarding damages: "Although generally the plaintiff in an action for damages has the burden of establishing the damage which resulted from the defendant's ... breach of contract, it is the defendant who has the burden of establishing matters asserted in mitigation or reduction of the amount of the plaintiff's damages." *See also, Alaska Children's Servs.,* 677 P.2d at 902 (holding "the burden of proving mitigation or failure to mitigate falls on the breaching party").

[¶ 28] Buyers put forth evidence of future damages, including future lost profits, and there was evidence that they may have incurred expenses to finance part or all of the purchase. They also presented evidence suggesting they could have purchased the property outright, incurring little or no financing costs. Sellers had the responsibility to convince the jury that debt service costs would reduce Buyers' future damages. They did little in that regard, nor did they request that the district court specifically instruct the jury to consider debt service in calculating Buyers' future damages. Moreover, Sellers do not direct us to any legal authority suggesting the district court's failure to specifically instruct the jury to account for the financing costs in its award was erroneous. The jury was left to sift through the evidence and fashion an appropriate future damages award. The record supports its efforts to do so.

[¶ 29] Sellers defended this case on the theory that the parties had not entered into an enforceable contract, and did not expend much time or effort on the damages element of Buyers' claims. Buyers, on the other hand, presented credible, though perhaps not overwhelming, evidence of the benefits they

sel's statement is confirmed by documents in the record which appear to summarize a closing

argument.

would not realize because of Sellers' breach. When Mr. Veys admitted at trial that an agreement had been reached, Sellers' defense was seriously eroded, and that was reflected in the jury's verdict. We conclude, as did the district court, that the jury award fell within the mathematical parameters supported by the evidence and the reasonable inferences flowing there from. On appeal, Sellers have a heavy burden in challenging the sufficiency of the evidence to support the jury's award of future damages to Buyers. Considering the record presented here and the applicable standards of review, we must conclude Sellers have not met their burden.

[¶ 30]   Affirmed.