FILED
COURT OF APPEALS
DIVISION II

2014 AUG 12 PM 12: 45

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| ALAN J. VEYS; LONE EAGLE RESORTS, INC.; and ALAN J. VEYS PROPERTIES, LLC,<br><br>Appellants,<br><br>v.<br><br>MICHAEL LONG and ANN LONG; OFFICE OF P. MICHAEL LONG; and P. MICHAEL LONG, P.S., INC.,<br><br>Respondents. | No. 43674-4-II<br><br><br><br>UNPUBLISHED OPINION |

HUNT, J. — Alan J. Veys, Lone Eagle Resorts, Inc., and Alan J. Veys Properties, LLC appeal the superior court's grant of summary judgment dismissal of their legal malpractice action against Michael Long, Ann Long, Office of P. Michael Long, and P. Michael Long, P.S., Inc. Veys argues that summary judgment was improper because (1) Long's professional negligence in representing Veys in the sale of his Alaska lodge was the proximate cause of Veys' damages from that sale; (2) Veys' recovery should not be limited to $300,000, the settlement offer that Veys rejected in a separate, though related, Wyoming lawsuit; and (3) the statute of limitations did not bar Veys' additional claims not related to the sale of his lodge. We reverse the superior court's summary judgment dismissal of Veys' legal malpractice action against Long and the imposition of a $300,000 damages cap; and we remand this claim to the superior court for trial. We affirm the superior court's summary judgment dismissal of Veys' other claims not related to the sale of Veys' lodge.

## FACTS

Veys and attorney Long were longtime friends before Long ever provided legal services to Veys. In 1994, Long purchased a piece of accretion land along the Cowlitz River under the name Columbia Realty Services, a company Long owned with his ex-wife. That same year, Veys paid Long $2500 for a one-half interest in this property. Columbia Realty Services later dissolved.

### I. LODGE SALE NEGOTIATIONS

Veys also owned and operated a fishing lodge, the Pybus Point Lodge on Admiralty Island, Alaska. In spring 2004, Marvin Applequist, Bruce Reed, and Val Jones (Purchasers) attempted to purchase this lodge from Veys. Veys hired Long as legal counsel to negotiate the sale; Veys also hired accountant, Jerome "Tonk" Fischer, to work with him and Long on this transaction. Attorney Darin Scheer represented the Purchasers. During March and April 2004, the parties negotiated the terms of sale and began drafting a purchase and sale agreement (PSA). On May 4, Veys faxed Long a handwritten note listing multiple substantive terms he wanted included in the PSA. On May 10, Long sent Scheer an email requesting that these terms be included in the PSA.

### A. Original PSA

On May 30, Veys, the Purchasers, and Scheer met with Long at Long's Longview office to negotiate the final details of the purchase. During this meeting, Applequist told Veys that he (Applequist) had to notify his company by June 3 if he was planning to leave his job to take over the lodge. The parties agreed that (1) Scheer would draft a PSA memorializing the terms on which they had reached agreement that day, and (2) by June 18 they would incorporate as

exhibits to the PSA any additional terms they might negotiate, subject to their later mutual agreement. Addressing Applequist's timing concerns, the parties discussed inserting into the PSA a "cram down" clause, which would provide that once signed, the PSA would bind all parties. Clerk's Papers (CP) at 10. In essence, this "cram down" clause would guarantee that the original PSA terms agreed to on May 30 would bind the parties, even if they could not agree on any later additional terms or exhibits. CP at 10. At the end of the May 30 meeting, the Purchasers proposed a purchase price of $2.8 million, $600,000 of which Veys would finance.

On May 31, Scheer emailed the proposed final version of the PSA to Veys and Long. This proposed PSA, in pertinent part, listed the lodge's sale price, the property description, and contingencies that Veys had to meet. These contingencies included Veys' obligations (1) to provide title insurance to the Purchasers, (2) to inform the Purchasers about all operational and managerial decisions that Veys had made relating to the lodge, and (3) to allow the Purchasers to review all lodge expenses and financial records. The PSA further provided that Wyoming was the choice of venue but Alaskan law would govern any legal disputes arising from the PSA.

Scheer's proposed PSA also included the previously discussed "cram down" provision, Section 2.1.1(a):

> In consideration of the transfer by the Seller to the Purchaser of the Purchased Assets, the Purchaser shall pay to the Seller the aggregate purchase price of Seller's choice of $2,800,000 (with Seller to carry amounts excess of $2,000,000) or $2,650,000 (cash at closing) (with either amount being inclusive of the down payment) (the "Purchase Price"), contingent upon the conditions precedent described in Sections 9.5, 9.6, and 9.7 of this Agreement ("Conditions Precedent"). Seller's election options are set forth below. Seller must declare its choice of Purchase Price in writing on or before 5:00 pm MDT on June 4, 2004, or the Purchase Price will automatically be $2,800,000 under the terms set forth herein. Seller is bound by all terms of this Agreement immediately upon signing, regardless of whether Seller elects on or before the deadline set forth above. **REGARDLESS OF WHICH PURCHASE PRICE SELLER ELECTS, IT IS**

**UNDERSTOOD AND AGREED THAT PURCHASER IS ACTING IN RELIANCE ON THE FACT THAT SELLER IS BOUND TO ALL TERMS OF THIS AGREEMENT IMMEDIATELY UPON SIGNING.**

CP at 422. Significantly, the proposed PSA did not contain most of the requests that Veys had communicated to Long on May 4.

That same day, May 31, Long emailed Veys Scheer's proposed PSA and asked Veys to confirm receipt, to review, and to comment on it. But Veys could not open the PSA document attached to Long's email. The next day, June 1, Long faxed Veys only the PSA signature page, which Veys signed and faxed back to Long.[1] Once Veys signed the document he was bound to the terms of the original PSA, as provided by the "cram down" provision. Long did not confirm that Veys had received the proposed PSA, which included the new "cram down" provision; nor did Long review the PSA terms with Veys. As a result, when Veys signed the signature page, he did not know that his requested changes had not been incorporated into the PSA.

On June 3, Scheer emailed Veys, with a copy to Long, asking whether Veys wanted to proceed with the lodge sale at a selling price of either $2.8 million with a potential $600,000 "carry"[2] or $2.65 million, which amount the Purchasers would pay in full at closing. CP at 204. Veys responded that, before choosing either option, he wanted to discuss the selling price further with his accountant. Later that day, Scheer sent an email to both Long and Veys, to which he attached a final draft PSA. In this email Scheer (1) again asked whether Veys wanted $2.65

---

[1] Veys' brief asserts it was "agreed between them that Long would not deliver the signature page to Buyers' attorney Scheer until so authorized by Veys." Br. of Appellant at 13. But Veys' record cite does not reflect this agreement.

[2] Scheer's email proposed, "[E]ither you *carry* at 2.8 or we pay cash at 2.65." CP at 203 (emphasis added). By "carry" the parties appeared to have meant that Veys would finance $600,000 of the purchase price.

million cash at closing or $2.8 million with "carry amounts over $2 million," CP at 205; and (2) Scheer also conspicuously noted that Veys would be contractually bound as soon as the Purchasers received his signed PSA signature pages, regardless of whether Veys had elected the payment amount and method. Veys emailed Scheer, replying that he (Veys) had been trying to call Scheer, that "*it [was] a go either way,*" and that he would contact Scheer; Veys also asked Scheer to forward this email correspondence to Long because Veys was having trouble emailing Long. CP at 210 (emphasis added).

## B. Failed Requests for Additional PSA Terms

On June 5, Veys contacted Scheer and Applequist, (1) expressing his regret about having decided to sell the lodge; (2) asking whether the Applequist Group was willing to "star[t] over," CP at 213; and (3) stating that if the Purchasers were not willing to "star[t] over," Veys would take their $2.65 million cash offer. CP at 213. The next day, Veys emailed Long that he had had only 50 minutes to read the PSA, he was not happy with it, and he wanted modifications, such as the right to terminate the PSA under certain conditions and the right to purchase items for personal use.

On June 11, Long emailed Veys and Veys' accountant (1) reminding them about the upcoming June 18 deadline for new PSA terms and exhibits, and (2) reminding Veys that the "cram down" provision already bound him to the existing PSA terms (the signature page for which Veys had signed on June 1). On June 14, Veys replied to Long that he hoped he had the right and option to decline selling the lodge and sent Long a separate email stating that he did not receive a copy of the final PSA. Over the next several days, Veys continued emailing Long

about additional terms[3] he wanted included in the PSA and reiterating that he was "worried" about the PSA. CP at 682.

On June 17 and 18, Long emailed Scheer and the Purchasers an amended version of the PSA that included new terms that Veys wanted, including that (1) "the Lodge" would pay all expenses for repairs and maintenance; (2) any subsequent lodge owners would have the right to purchase fuel at "lodge cost"; (3) any future or subsequent lodge owners would have the right, but not the obligation, to "put in docks at pilings"; (4) Veys would sell his plane to "the Lodge" at fair market value; and (4) "all fuel" that Veys had purchased in the previous year would be an additional cost to the Purchasers, to be paid in cash at the time of closing. CP at 704.

Responding to Long's emails, on June 22 Scheer wrote Long a letter (1) stating that the Purchasers agreed to extend the deadline for finalizing exhibits (additional PSA terms) until July 23, (2) chastising Long for creating completely new terms on which the parties had previously failed to agree, and (3) telling Long that the Purchasers would not agree to these new terms. Long responded to Scheer with a June 24 letter stating that he (Long) did not agree that the original PSA bound all parties until they could mutually agree on new or additional "replacement exhibits." CP at 221.

Scheer again responded that (1) he disagreed that the PSA did not bind the parties, given that Veys had signed the PSA (which the Purchasers had received on June 5) and had elected to accept the cash option selling price of $2.65 million and (2) the "cram down" provision, section 2.1.1(a), expressly provided that the final PSA and initial exhibits were binding upon all parties

---

[3] These additional terms included setting the maximum number of guests at the house on the lodge property, payment of expenses for the house, regulation of future owners of the house, attorney fees, the addition to lodge selling price of costs for fuel purchased by Veys, and the selling price of Veys' plane.

unless the parties later mutually agreed on and executed replacement exhibits. Around June 24, the Purchasers moved into the lodge for the summer to learn its day-to-day operations.

On August 27, Veys emailed Long that he (Veys) and his accountant had looked at the PSA. Veys asked Long (1) to review the PSA, (2) to determine when the purchase price deposit was due, and (3) to advise him because he did not want to sell the lodge or be "taken to the cleaners." CP at 246. Veys closed his email by stating that he wanted "the contract to be terminated," that he "want[ed] [his] lodge back," and that the contract had been "done at a very bad time in [his] life." CP at 246.

That same day, August 27, Scheer sent Long a demand letter and notice of non-compliance, stating that Veys had not complied with the PSA in failing to provide statements of the lodge's net revenues and costs; a list of the lodge's lease agreements; a list of all lodge licenses and required governmental or official approvals, permits, or authorizations for the business and operations; documents of each "Purchased Other Agreements" relating to the lodge; information about managerial and operational decisions Veys had made for the lodge; a list of insurance policies that Veys maintained; and access to the lodge's financial records. CP at 247. Scheer further noted that Veys' failure to provide such documentation could lead to the Purchasers taking legal action. Scheer reiterated that, because the parties could not agree on replacement exhibits or additional terms, the original PSA bound them. And Scheer asked for wire transfer instructions for the Purchasers to tender their $50,000 deposit for the lodge's purchase.

On September 1, Long responded to Scheer's demand letter and notice of noncompliance, informing Scheer that Veys wanted the Purchasers to "pack their bags and leave the island." CP

7

at 254. After a heated discussion with Veys, the Purchasers left the lodge around September 6.

On September 9, Long sent a final offer from Veys, expressing the terms under which Veys would agree to sell the lodge to the Purchasers. The parties did not reach a new agreement.

## II. PROCEDURE

### A. Purchasers' Breach of Contract Action against Veys in Wyoming

On October 7, 2004, in Wyoming District Court, the Purchasers sued Veys for breach of contract, breach of the implied covenant of good faith and fair dealing, promissory estoppel, anticipatory repudiation, and specific performance. *Veys v. Applequist*, 155 P.3d 1044, 1048 (Wyo., 2007). Veys hired Wyoming attorney Don Riske to defend him in this litigation.

Before trial, around February 2005, the Purchasers offered to dismiss the lawsuit if Veys agreed either (1) to sell the lodge and his Pybus Point residence to Purchasers for $2 million, or (2) to pay the Purchasers a settlement amount of $300,000. Riske consulted with Veys and received Veys' authorization and direction to reject this offer. The case went to trial.

A jury determined that the parties had entered into an enforceable contract that Veys had breached; and it entered a verdict against Veys for $3 million in damages. *Veys*, 155 P.3d at 1048. The Purchasers made a final settlement offer to release Veys from additional liability if he paid them $850,000 in cash; Veys also rejected this settlement offer. Veys appealed, and the Wyoming Supreme Court affirmed the jury verdict against him. *Veys*, 155 P.3d at 1052-53.

### B. Veys' Legal Malpractice Action against Long in Washington

On June 19, 2009, Veys sued Long for legal malpractice in Cowlitz County Superior Court, naming Long, Long's office, and his wife, Ann Long, as defendants; Veys alleged both breach of contract and tort bases. Veys alleged that (1) Long had failed to advise Veys and to

protect his interest in the PSA negotiations, (2) Long's actions and advice to Veys had resulted in Veys' breach of the PSA that led to the Purchasers' Wyoming lawsuit against him, (3) Long had failed to protect Veys from seizure of his assets after judgment was entered against him in the Wyoming action, (4) Long had been negligent in advising Veys in both the PSA transaction and in connection with their 1994 joint purchase of the Cowlitz River accretion land,[4] and (5) Long had breached the duties and obligations he owed Veys under their contract for legal services.[5]

Long moved for summary judgment as to Veys' negligence-based malpractice claims, arguing that (1) Veys' alleged damages had arisen from his own decision to breach a binding contract, not from Long's actions; (2) alternatively, the superior court should limit Veys' damages to $300,000, the settlement offer that Veys had rejected in the Wyoming trial and the only damages arguably attributable to Long; and (3) the statute of limitations barred Veys' malpractice action claims unrelated to the PSA, based on Long's alleged malpractice in connection with the 1994 Cowlitz River accretion land purchase. For summary judgment purposes, Long conceded his professional duty to Veys and breach of duty in conjunction with Veys' legal malpractice claim related to the PSA. In support, Scheer submitted a declaration stating that the Purchasers would have "walked away from the deal as friends had Veys or Long insisted on any of the Rejected Requests be included in the June 3, 2004 PSA." CP at 293.

The superior court orally granted Long's summary judgment motion in its entirety. The superior court also issued a letter ruling granting summary judgment to Long, reasoning:

---

[4] More specifically, Veys alleged that Long had failed to advise him about a conflict of interest and to seek independent legal counsel in connection with Veys' 1994 purchase of half of Long's interest in the Cowlitz River accretion land.

[5] On appeal, Veys does not pursue dismissal of his contract-based malpractice claim. Thus, we do not further address it.

> It is apparent to me that the plaintiff knew of the PSA and for whatever reason decided not to perform under the contract. This was of his own volition which was thoroughly vetted in the Wyoming lawsuit brought by the buyers that resulted in a verdict against Veys.

CP at 793. In a later written order, the superior court (1) granted summary judgment as to all of Veys' claims, dismissing them with prejudice; (2) noted that it had relied on the theory of "legal impossibility" as an additional basis for the relief granted; and (3) also granted Long's alternative motion for partial summary judgment dismissal of Veys' claims that were not related to the PSA and which had been filed after expiration of the applicable statute of limitations. CP at 881.

Veys appeals.[6]

## ANALYSIS

### I. LEGAL MALPRACTICE

Veys argues that summary judgment on his PSA-related claims was improper because he produced evidence that he would have obtained a better outcome for the sale of his lodge but for Long's negligence in representing him during the PSA negotiations—namely that Veys would have obtained the sales terms he wanted or the Purchasers would have "walked away" from the deal instead of suing him in Wyoming. Veys then argues that, as a result, there was an issue of material fact about whether Long's negligence was the proximate cause of Veys' PSA-related damages. Br. of Appellant at 36. We agree.

Veys also argues the summary judgment was improper in his malpractice action against Long for non-PSA related transactions, in particular Long's alleged malpractice in connection with Vey's 1994 purchase of half of Long's Cowlitz River accretion property because (1) his

---

[6] Ann Long filed a separate brief, stating that as a tangential party to the action and as a result of her former marriage to Long, she joins and incorporates Long's briefing on appeal.

No. 43674-4-II

(Veys') damages were ongoing, "continu[ing] to this day"; and (2) thus, Veys' claim was not barred by the statute of limitations. Br. of Appellant at 48. This argument fails.

## A. Standard of Review

We review a summary judgment de novo, engaging in the same inquiry as the trial court and viewing the facts and any reasonable inferences therefrom in the light most favorable to the non-moving party, here, Veys. *Associated Petroleum. v. NW Cascade*, 149 Wn. App. 429, 434, 203 P.3d 1077 (2009). Summary judgment is proper when no genuine issue of material fact remains and the moving party is entitled to judgment as a matter of law. *Diamond "B" Constructors, Inc. v. Granite Falls Sch. Dist.*, 117 Wn. App. 157, 160-61, 70 P.3d 966 (2003). A genuine issue of material fact exists where reasonable minds could differ on the facts controlling the outcome of the litigation. *Ranger Ins. Co. v. Pierce County*, 164 Wn.2d 545, 552, 192 P.3d 886 (2008). To defeat summary judgment, the non-moving party must assert specific facts and cannot rely on mere speculation. *Ranger*, 164 Wn.2d at 552.

## B. PSA-Related Claims, Proximate Cause

To establish legal malpractice, a plaintiff must show "(1) the existence of an attorney-client relationship giving rise to a duty of care to the client, (2) act or omission in breach of the duty, (3) damages to the client, and (4) proximate causation between the breach and damages." *Smith v. Preston Gates Ellis, LLP*, 135 Wn. App. 859, 863–64, 147 P.3d 600 (2006), *review denied*, 161 Wn.2d 1011 (2007). For summary judgment purposes, Long conceded the issues of duty and breach of duty with respect to Veys' PSA claims and moved for summary judgment based on lack of proximate causation. Accordingly, we address only proximate cause.

11

The burden is on the legal malpractice plaintiff to show that the attorney's negligence was the proximate cause of his injury. *Hansen v. Wightman*, 14 Wn. App. 78, 88, 538 P.2d 1238 (1975). Proximate cause is the nexus between breach of duty and resulting injury. *Halvorsen v. Ferguson*, 46 Wn. App. 708, 719, 735 P.2d 675 (1986). Proximate cause has two elements: cause in fact and legal causation. *City of Seattle v. Blume*, 134 Wn.2d 243, 251, 947 P.2d 223 (1997). "Cause in fact refers to the 'but for' consequences of an act, that is, the immediate connection between an act and an injury." *Blume*, 134 Wn.2d at 251–52. The plaintiff must demonstrate that "but for" the attorney's negligence he would have obtained a better result. *Smith*, 135 Wn. App. at 864. Legal causation is based on policy considerations in determining how far the consequences of an act should extend. *Blume*, 134 Wn.2d at 252. Although proximate cause is usually an issue for the fact finder, the trial court can decide proximate cause as a matter of law if "reasonable minds could not differ." *Smith*, 135 Wn. App. at 864.

To avoid summary judgment on proximate cause, Veys needed to show that Long's breach of his professional duties caused Veys harm. In the context of this negotiated contract, Veys had to show that but for Long's negligence, he would have been able to obtain a "better" contract (more favorable to Veys) or an improved outcome.[7] *See Smith*, 135 Wn. App. at 864.

In *Smith*, Smith sued Preston Gates Ellis, LLP, alleging legal malpractice for its representation of him in drafting and reviewing a contract for the construction of his "dream home." *Smith*, 135 Wn. App. at 863. Division One of our court held that, even though Smith

---

[7] Although not binding here, we note the Colorado Supreme Court's holding in *Gibbons v. Ludlow*, 2013 CO 49, 304 P.3d 239 (2013) that a legal malpractice plaintiff can show a better litigation result by proving that if his attorney had provided competent representation, (1) he (the plaintiff) would have been able to obtain a better bargain in the underlying transaction, or (2) he would have been better off "walking away from the underlying transaction." *Gibbons*, 304 P.3d at 242.

noted various deficiencies in the construction contract to support his malpractice claim, summary judgment was appropriate because he had failed to demonstrate, with specificity, that but for these deficiencies he would have had a better result. *Smith*, 135 Wn. App. at 865. Smith alleged that if he had been advised of the deficiencies in the contract, he never would have signed it. *Smith*, 135 Wn. App. at 865. The court held, however, that this allegation was insufficient to defeat summary judgment because Smith could not identify an alternative that would have led to a better outcome. *Smith*, 135 Wn. App. at 865.

Here, Veys argues that Long was negligent in failing (1) to inform Veys that the final PSA Long had Veys sign did not contain the terms that Veys had expressly requested; (2) to review the PSA with Veys before emailing him the signature page to sign, despite knowing that Veys had been unable to open and to read the PSA Long had originally emailed to him; and (3) to explain to Veys the impact of the PSA's "cram down" provision on his ability to incorporate his requested terms. Unlike in *Smith*, Veys produced clear evidence that but for Long's negligence Veys would have obtained a better outcome—Veys' desired terms for sale of the lodge or no sale at all. Veys declared that he had no pressing need to sell the lodge and would have refused to sell if his requested terms were not included in the PSA. Similarly, Scheer's declaration established that the Purchasers would have "walked away from the deal as friends had Veys or Long insisted on any of [Veys'] Rejected Requests be included in the June 3, 2004 PSA." CP at 293.

Long argues, and the superior court found, that the cause of Veys' damages was his own willful breach of the PSA that he signed. The key evidence, however, which we assume is true for summary judgment purposes, is that (1) when Veys signed the PSA signature page, he had

not seen the entire PSA, was unaware that it contained the "cram down" clause, and did not know that his requested terms had not been included; (2) Veys would not have signed the PSA if Long had informed him that the requested terms had not been included; and (3) the Purchasers would have walked away from the deal if Veys had insisted on his requested terms. As a result, there is sufficient evidence to show that but for Long's negligence, Veys would not have signed the PSA, the PSA would not have been executed, and Veys could not have breached it.

Veys asserted specific facts to rebut Long's claims and to establish a question of material fact about whether Long's alleged negligence was the proximate cause of Veys' injuries. Therefore, we hold that the superior court erred in granting Long's motion for summary judgment.

## C. Non-PSA-Related Claims

Veys argues that the superior court improperly dismissed his other, non-PSA based claims as barred by the statute of limitations.[8] He asserts that (1) the claims related to his 1994 purchase of half of Long's interest in the Cowlitz River accretion land did not fall outside the statute of limitations because they were subject to the parties' "Tolling Agreement"[9]; and (2) that because Long had failed to convey any interest to Veys, these claims were ongoing, and thus not barred by the statute of limitations. But contrary to RAP 10.3(a)(6), other than asserting this his claim is "ongoing," Veys does not support his argument with citations to legal authority; nor does he otherwise attempt to explain how the superior court erred in dismissing these claims

---

[8] These claims related to the Cowlitz River accretion land and the statute of limitations.

[9] Veys and Long entered into a "Tolling Agreement" for claims arising only in relation to the lodge sale transaction. CP at 286. Under this "Tolling Agreement," the parties agreed to toll the statute of limitations for any claims arising from the sale of the lodge. CP at 286.

14

related to a 1994 land transaction were not barred by the applicable three-year statute of limitations for legal malpractice actions,[10] for which he similarly fails to provide a citation to the Revised Code of Washington.

An appellate court will not review issues that a party inadequately briefs or treats in passing. *State v. Thomas*, 150 Wn.2d 821, 868-69, 83 P.3d 970 (2004). Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial consideration. *State v. Johnson*, 119 Wn.2d 167, 171, 829 P.2d 1082 (1992). Generally, an appellate court will not review an assignment of error without argument and citation to authority. *State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002). Thus, we do not further address this argument.

## II. ALTERNATIVE PARTIAL SUMMARY JUDGMENT LIMITING VEYS' RECOVERY

Veys also argues that the superior court erred in granting Long's alternative motion for partial summary judgment limiting Veys' potential recovery to $300,000, the settlement offer amount offered at the Wyoming trial, which Veys had refused. We do not reach this argument.

Long brought this motion for partial summary judgment only as an *alternative* in the event that the superior court denied his primary motion for full summary judgment. Because the superior court granted Long's primary motion for full summary judgment, it did not need to address limiting Veys' recovery—the subject of Long's alternative motion. Moreover, resolving this issue would have been relevant only if the superior court had allowed some of Veys' claims to remain such that there were potential damages to limit. But such was not the case. We hold that the superior court's ruling on this damages cap was premature. Thus, we reverse the

---

[10] RCW 4.16.080(3).

superior court's $300,000 cap on Veys' damages and leave for the trial court on remand to address any potential damages limitation if necessary.

We reverse the superior court's summary judgment dismissal of Veys' legal malpractice claims against Long related to the sale of his lodge and remand for trial. We also reverse the superior court's $300,000 damages cap. And we affirm the superior court's summary judgment dismissal of Veys' other claims not related to the sale of the lodge.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Hunt, J.

We concur:

Bjorgen, A.C.J.

Maxa, J.